[No. S004559, Crim. No. 23197. Nov. 28, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANCIS GERARD HERNANDEZ, Defendant and Appellant.

320

COUNSEL

Edward M. Medvene, under appointment by the Supreme Court, Daniel M. Petrocelli, Douglas J. Del Tondo, Ronald A. DiNicola and Mitchell, Silberberg & Knupp for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, William R. Weisman, Mark Alan Hart, Carol Wendelin Pollack and Robert S. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ARGUELLES, J.—This case involves the forcible rape, sodomy, and murder of two young women, Edna Bristol and Kathleen Ryan, in early 1981. For these crimes, defendant was convicted by a jury of two counts of first degree murder (Pen. Code, §§ 187, 189),[1] two counts of forcible rape (§ 261, subd. (2)), and two counts of forcible sodomy (§ 286, subd. (c)). The jury also found true special circumstance allegations that each murder occurred in the commission of rape (§ 190.2, subd. (a)(17)(iii)) and sodomy (§ 190.2, subd. (a)(17)(iv)) and that defendant was, in this proceeding, convicted of more than one murder (§ 190.2, subd. (a)(3)). At the penalty phase, the jury returned a sentence of death as to each murder. This appeal is automatic. (§ 1239.) We conclude that one multiple-murder special circumstance should be vacated but the judgment should be affirmed in all other respects.

---

[1] All references hereafter are to the Penal Code unless otherwise indicated.

GUILT PHASE

FACTS

A. *Discovery of the Murders*

The nude body of 21-year-old Edna Bristol (hereafter Bristol) was discovered in a grassy area near Marshall Junior High in the City of Long Beach around 6 a.m. on January 29, 1981. An autopsy revealed the victim had died of asphyxiation due to suffocation or strangulation. There were ligature marks on both wrists and ankles where the victim had been taped. Contusions and abrasions to the lips were consistent with the victim being struck in the mouth. There was bruising and tearing in the anal and vaginal areas consistent with premortem intrusion of a large object such as a baseball bat, and these areas produced a bloody discharge. Marks to the right breast had occurred after death and were consistent with a human bite. The pubic hair had been burned. Cigarette butts were found at the scene and further examination by a forensic criminalist revealed traces of elements consistent with the flint of a cigarette lighter. Twenty-three small turquoise rubber bands were found on the ground near the body.

Five days later, on February 3, 1981, around 5:45 a.m., the nude body of 16-year-old Kathy Ryan (hereafter Ryan) was found in a grassy area near Millikan High School in Long Beach. Both Marshall Junior High and Millikan High School are near El Dorado Park. Autopsy revealed that Ryan, like Bristol, had died of asphyxiation possibly due to strangulation. Damage to Ryan's lips and teeth suggested a blow to the mouth; there was a cut on the chin; and her nose had been fractured. Bruising and tearing in the anal and vaginal areas, as extreme and unusual as with the other victim, suggested a large object such as a baseball bat had, before death, been repetitively forced into each of these areas causing bleeding. A large abrasion over the spine suggested the body had been dragged. Postmortem wounds included bite marks to both breasts and five horizontal and three vertical slashes to the abdomen in a tic-tac-toe pattern. Ryan's pubic hair had been burned and forensic analysis suggested some flammable material had been used. Cigarette butts, a burnt match, an empty match book and some black electrician's tape were found near the victim. A search of the surrounding area yielded various items of clothing the victim had apparently worn when last seen alive.

B. *Information Leading to Defendant's Arrest*

Ryan had lived at home with her stepmother. When Ryan's stepmother awoke around 5:30 a.m. on February 3, she found the living room lights still

on and the drapes and sliding glass door open. The victim's bed had not been slept in and her bedroom window was open and missing its screen. She had last seen Ryan the night before. Around 8 p.m., the victim had left with a girlfriend, and she had returned home around 10 p.m. to get her pool cue, saying she was going out to play pool.

As Ryan's stepmother left for work, she noticed the pool cue and the victim's jacket were on the living room floor. The victim's purse was outside on the ground and items from the purse were spilled out. Ryan's stepmother drove her son to Millikan High School and noticed police activity near the school. When she arrived at work, a friend told her a girl had been killed, and she "just knew" it was Ryan. She contacted police and ultimately identified the murder victim as her stepdaughter based on photographs, identification of the discarded items of clothing police had found in the area, and a broken necklace the girl had worn.

When police began to piece together what Ryan had been doing the night of her murder, they learned that a group of young people regularly met in El Dorado Park and that on the night of February 2, the group included defendant and Ryan. A girlfriend named Tracie Barr had picked up Ryan at her home that evening, and they had driven to El Dorado Park where they met defendant and other regulars including Chris Jackson, Bob Beeler, and Diva Sarzynski. Later they decided to go to a local pizza parlor to play pool. Barr drove Ryan back to her house to retrieve her pool cue, and they then went to Big John's Pizza Parlor, stopping at a liquor store along the way to pick up defendant who had parked his van there.

During the evening of playing pool and drinking beer, it was evident to several in the group that defendant was focusing considerable unwelcome attention on Ryan. He tried to put his arms around her, pinched her in the buttocks and put his hands on her hips, but she kept pushing him away. He apparently was also aggressive with other young women, pinching Sarzynski and Barr and grabbing Barr's breast. Chris Jackson tried to intervene, but at one point defendant grabbed Jackson by the throat and pushed him away. Finally, Jackson persuaded defendant to go outside and smoke some marijuana.

Outside, defendant told Jackson he wanted to make a "sandwich" out of Ryan; he wanted to "fuck her in the butt until she screams." He told Jackson he would "get some tonight or tomorrow night."[2] The party ultimately broke up around 1 or 1:30 a.m., on February 3; and departing in

---

[2] When told by police that Ryan was dead, Jackson became emotional and blurted out: "The guy you want is Francis Hernandez."

Barr's car were defendant, the victim, Beeler, and Sarzynski. First they dropped defendant off at the liquor store where he had left his van. They then drove toward Ryan's home, and Barr and Sarzynski noticed defendant followed them for a way in his van before turning around. Ryan seemed a little nervous, and witnesses told somewhat inconsistent stories as to whether she was anxious to get home to avoid seeing defendant or whether she anticipated defendant was coming to her house and planned to meet him.

## C. *Defendant's Arrest*

After speaking to the young people who had been at El Dorado Park and Big John's Pizza Parlor, attention focused on finding defendant. From the young people, police had a description of defendant's old, dark green Dodge van and obtained its license number. This same van had been in an incident only a few months before in September 1980 when someone driving a van of this description had tried to run another person down. Defendant was stopped about a mile from El Dorado Park when driving away from the scene of the incident, but the victim was unable to positively identify him as the assailant.

Defendant had been the subject of a second police contact at 9:45 p.m. on January 26, 1981, only days before the murder of Bristol, when police officers proceeded to El Dorado Park to check for possible narcotics and alcohol violations which were apparently frequent in that area. Defendant was standing with his girlfriend and another person, and police smelled burning marijuana. As one of defendant's companions had an outstanding warrant, that person was arrested and searched, and marijuana was found.

Police were of the opinion that Bristol and Ryan had not been killed at the locations where their bodies were found but had been transported there after the killings. Police had found burnt orange or rust colored carpet fibers near Ryan's body and in her pubic hair. They were told that defendant's van was carpeted. Jackson admitted having given defendant a knife as a gift, and officers were aware of the tic-tac-toe cuts on Ryan's body.

In the early morning hours of February 4, 1981, officers went to defendant's residence and saw his van. Looking through the van's window and shining a flashlight inside, they could see a Millikan High School banner and a large number of small greenish or turquoise rubber bands on the gearshift lever. The carpeting in the van was a burnt-orange or rust-brown color.

Officers staked out the van, waiting to arrest defendant for the murder of both Bristol and Ryan; and finally around 2 p.m. that day, when he

approached the van and began to open the door, defendant was arrested. While waiting for a search warrant to arrive, officers went to the nearby residence, and the door was answered by Frank Hernandez, defendant's father, who was informed of his son's arrest. He admitted officers into the residence and gave both oral and written consent to search. Nevertheless, officers awaited arrival of the warrant. A search of defendant's room in the residence yielded a set of handcuffs, two "Bic" cigarette lighters, and a broken gold necklace in which was caught a small amount of hair later found to be consistent with Ryan's hair.

Meanwhile, defendant was advised of his constitutional rights[3] and waived them in writing, also giving officers his consent to search his residence and van. From the van, officers removed a ring bearing two different-sized stones. It was determined that this ring was consistent with bruises to Ryan's mouth. The carpet fibers found with Ryan's body and fibers removed from Bristol's body matched the carpet in the van. A grey material found on Bristol's body matched a sleeping bag found in the van which also bore traces of blood consistent with Bristol's blood type.

Other blood stains in the van were consistent with Ryan's blood. A baseball bat bearing traces of human blood was found, as were burnt matches, a matchbook, and one of Ryan's tennis shoes. A flashlight found in the van was consistent with certain bruises on Ryan's abdomen; and tape, a hunting knife, and a piece of glass were also found. Saliva found on both Ryan's and Bristol's nipples was consistent with defendant's saliva. Dental impressions were taken from defendant; and due to peculiar positioning of some of his teeth and the depth of some tooth marks on the victims, defendant was identified as the person causing bite marks on Ryan. Vaginal swabs from both victims showed the presence of semen.

## D. *Defendant's Admissions*

### 1. *The Bristol Incident*

Defendant had agreed to speak with the police, and a lengthy statement was tape-recorded. In that statement and in other statements to police before and after the taped interview, defendant claimed that on the night of January 29, 1981, he had been drinking and smoking marijuana and was in a crazy mood. He decided to "find myself a homosexual to beat up on," and

---

[3] One officer testified that as police began reading defendant his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), he began reciting them himself and said he knew them. Officers told him to just "listen up" and completed the reading of his rights.

after allegedly beating and robbing someone, he went for a drive. It was then he saw Bristol hitchhiking and gave her a ride.[4]

In the course of the drive, however, he found he could not find her destination and became annoyed with her complaining about her problems. Defendant claims he asked Bristol to get out of the van, and when she refused to leave, he hit her and dragged her out. She allegedly said she would "do anything," so he threw her in the back of the van, then permitted her to resume her seat in front, and drove to another location. At this new location he parked, told her to get in the back of the van and to take her clothes off, and then had sexual intercourse with her.

He claims she was "willing" but perhaps she "thought" it was forcible. In any event, as he dressed, she suddenly began kicking him and the van. Defendant then "got mad" and "went beserk." He tied her wrists and ankles, taped her mouth so her screams would not be heard, and sodomized her; and in the course of sodomizing her, he forced her up against the hot engine cowling of the van in order to burn her breasts.

He claimed that a second time he permitted her to leave the van, but again she started screaming, kicking, and hitting him; so he pushed a piece of cloth over her mouth and nose and held her by the throat. He claims he did not realize when she ceased to struggle that she had asphyxiated and he thought he heard a heartbeat. Finally he drove to the local junior high school and put her on the grass. He admitted flicking several matches into her pubic hair to hurt her for kicking him and putting a hole in the door of his van. He had no explanation as to how the rubber bands had ended up around the body.

### 2. The Ryan Incident

Defendant confirmed that on the evening of February 2, 1981, he met Ryan and some friends in El Dorado Park. He claimed to have been drinking all day and to have smoked more than one marijuana cigarette. At Big John's Pizza Parlor he drank more beer and smoked more marijuana. He was unsteady on his feet and dropped a glass of beer on the floor.

Defendant claimed that Ryan had invited him to stop by her house later that night. He had some trouble with his van, however, and did not catch up with the group until Ryan had been dropped off at her house. He claimed that when he honked, Ryan came out; and defendant drove around

---

[4]Defendant was apparently acquainted with Bristol, and had been seen with her on a prior occasion in El Dorado Park.

the corner, parked, and they talked. This developed into voluntary vaginal and anal intercourse;[5] and defendant maintained that rug burns on Ryan's back were from their voluntary sexual activity in the back of his van. But as defendant prepared to take her home, Ryan unaccountably got mad and began kicking and screaming. Defendant grabbed her around the throat and mouth to stop her screaming, but when she stopped struggling he did not at first realize she was dead.

Unsure of what to do, he finally drove to Millikan High School and, in dragging the body out of the van, Ryan's head hit the curb and he realized she was dead. He claims he singed her pubic hair with his "Bic" lighter[6] and cut up her stomach with a piece of glass he found in the area to make the body look different from Bristol's. Then as he drove home he tossed articles of her clothing out of the van. Defendant acknowledged that he "might" have bit her nipple during the time she was kicking and struggling. He admitted also that he had "probably" "put" a baseball bat into the vaginal and anal areas of both victims.

### E. *The Defense Case*

The defense case sought to minimize to some extent these horrendous facts. A friend portrayed defendant as trying to be affectionate with Ryan on the night of her murder, but not pursuing her once rebuffed. A defense expert questioned whether traces of flint or butane had been found on the victims' pubic hair, or whether the substances identified by the prosecution expert were consistent with soap or perfume residue. The defense suggested, although it did not stress, the element of accident in defendant not realizing that measures taken to "quiet" the victims would result in their suffocation. It did not abandon the idea that sex was engaged in voluntarily by each victim and that killing them was an unplanned, panicky response to their sudden outbursts.

Primarily, however, the defense sought to establish that defendant was an alcoholic incapable of forming the mental state required for murder and so inaccurately perceiving the reactions and feelings of those around him that he would not understand his sexual conduct to be rape or sodomy. On the basis of a one-and-a-half hour interview with defendant, a defense medical expert, Dr. Amer Rayyes, concluded defendant was an alcoholic and went on to describe the effects of alcoholism, including memory loss and memory

---

[5] Defendant acknowledged, however, that "she was sort of hesitant at first, and then I got mad, and then she said oh, okay, cuz I pushed her arms back." He later reiterated that she engaged in intercourse "freely."

[6] He also claimed to have placed some sort of flammable liquid on the pubic area of both victims.

distortion (such as euphoric memory and repressed memory of bad behavior). According to Dr. Rayyes, someone drinking beer and smoking marijuana, as defendant contended he had on the night of the Ryan homicide, would not be capable of forming an intent to kill. The expert conceded, however, that an alcoholic's ability to perceive the desires of others and form various mental states would depend on the events of the particular moment and his state of sobriety at that point. Therefore even an alcoholic while drinking could at a particular time intend to have sexual or anal intercourse against the will of his victim.

## DISCUSSION

## I

### *Denial of Motion for Change of Venue or Transfer to Another District*

 Defendant raises three issues concerning the impartiality and composition of his jury. The first involves whether the trial court erred in denying his motion for change of venue based on the ground that extensive pretrial publicity made it impossible for him to obtain a fair trial in Long Beach. Actually, as the Attorney General points out, the motion made was to transfer the matter from Long Beach to the Central District of the Los Angeles Superior Court; but whether viewed as a request for change of venue or a request for transfer, defendant's motion was properly denied.

Section 1033 provides that the superior court shall order a change of venue: "(a) On motion of the defendant, to another county when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county. . . ." Whether raised pretrial or on appeal, the reviewing court must independently examine the record and determine de novo whether a fair trial could not be had. Factors to be considered are the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim. (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1130 [240 Cal.Rptr. 585 [742 P.2d 1306]; *People* v. *Harris* (1981) 28 Cal.3d 935, 948 [171 Cal.Rptr. 679, 623 P.2d 240].)

 Only the first factor, the nature and gravity of the crimes, favored a change of venue in this case. Not only did we have a double murder, but the murders were particularly gruesome involving the sexual mutilation of young women. Defendant claims pretrial publicity in Long Beach was of "unprecedented proportions" and in a highly inflammatory way presented the crime as involving murder of two young non-Hispanic women by a Hispanic man. The record does not suggest, however, that publicity was

unusually extensive or particularly inflammatory given that even the most accurate reporting of the facts of the case would be somewhat gruesome.

Defendant submitted to the trial court 16 articles that had appeared in the Independent Press-Telegram and the Los Angeles Times between February 3, 1981, and March 19, 1981. Some of the information in those articles may have been problematic. The reader learned that defendant had confessed, that he had prior arrests as a juvenile and had been a California Youth Authority parolee, and that the victims had been sexually mutilated. He was called a former juvenile delinquent, and the intensive manhunt to capture him was described. But only one article revealed details of the autopsy including anal and vaginal lacerations and burned pubic hair. The victims were otherwise referred to as physically abused or sexually mutilated without particularly gruesome details being given.

As for descriptions of defendant, the scenario of a Mexican-American murdering young, white non-Hispanic women does not arise from these articles. Defendant is variously described as a Long Beach youth, a loner ousted from school due to a petty theft, a troublemaker, a nice kid, a model CYA parolee, a burly youth, and a stocky, blue-eyed former juvenile delinquent.

Noteworthy also is that the bulk of this publicity occurred two years prior to commencement of trial. Defendant notes that one article on pretrial delay in major criminal cases appeared in October 18, 1982.[7] Defendant's case was certainly not the sole focus of the article. In sum the nature and extent of news coverage did not mandate a change of venue.

As for remaining factors, the community in which publicity was most intense, Long Beach, was metropolitan in size, having a population of approximately 360,000. (U.S. Dept. of Commerce, Statistical Abstract of the United States 1984 (104th ed.) at p. 29; U.S. Dept. of Commerce, County and City Date Book 1983 (Statistical Abstract Supp.) at p. 661.) Of those jurors individually voir dired, only 42 percent were from Long Beach itself, the others coming from such areas as San Pedro, Harbor City, Lomita, Manhattan Beach, Torrance, Palos Verdes, Carson, Norwalk, Lakewood, Redondo Beach, and Pico Rivera. The defendant was not a stranger or newcomer to the community, and the victims were not particularly prominent. We conclude that factors traditionally considered in a motion for change of venue do not suggest a reasonable likelihood that a fair and impartial jury could not be had.

---

[7] As we discuss *post,* an article also appeared on April 28, 1983, after the guilt phase was complete and before commencement of the penalty phase.

Finally, since this case is before us on appeal from conviction rather than pretrial, it is also important to examine the actual voir dire of the jury to determine any prejudice from pretrial publicity. (*Anderson, supra,* 43 Cal.3d at p. 1131; *Harris, supra,* 28 Cal.3d at p. 949.) That is a particularly useful exercise in this case as the trial court conducted an individualized voir dire of approximately 111 prospective jurors to determine whether pretrial publicity had affected defendant's right to a fair trial. (See *Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 946 [187 Cal.Rptr. 455, 654 P.2d 225].)

A review of the questioning of this panel and the results of questioning the 16 individuals who constituted the jury and its alternates reflects, as noted above, that only 42 percent of the panel was from Long Beach. Only 31 percent of the jury that actually served in this case was from Long Beach itself. Of jurors individually questioned, about 37 percent had heard of this case, although typically that memory was vague and they could recall none of the details. Of the regular and alternate jurors who served in this case, four had heard something about it but they assured the court that they could decide the case on the evidence and not on anything they had heard. It is also useful to note that defendant did not exhaust his peremptory challenges, exercising only 18 of the 26 available. (See § 1070, subd. (a).)

■ If the above examination of the record shows no change of venue was required, it also supports the conclusion that the trial court did not abuse its discretion in declining to transfer this case within the county from Long Beach to the Central District of Los Angeles as defendant had requested. Los Angeles Superior Court rule 300, section 6 provides: "For the convenience of witnesses or to promote the ends of justice, an action or proceeding may be transferred by or with the consent of the Presiding Judge from one district to another. . . . Criminal actions may be transferred from one district to another in accordance with such policies as are established by the judge presiding in the Criminal Master Calendar Department in the Central District, for the convenience of witnesses or to promote the ends of justice. . . ." (See *Gray* v. *Municipal Court* (1983) 149 Cal.App.3d 373, 375 [196 Cal.Rptr. 808] [distinguishing transfer from change of venue]; cf. § 777 [offense triable in any competent court within jurisdictional territory in which it is committed].)

As the prosecutor noted, Long Beach was the residence of the victims and of the citizen witnesses scheduled to testify. The investigating agencies were in Long Beach; and the only witnesses anticipated to come from Los Angeles were from the coroner's office and the sheriff's crime laboratory. Given that the convenience of the great bulk of witnesses favored Long Beach and it had not been shown that publicity had rendered a fair trial

there unlikely, we conclude the trial court did not abuse its discretion in denying the request for transfer within the venue.

II

*Denial of Motion to Sequester the Jury*

Prior to commencement of trial, defendant, citing the danger of pretrial publicity, requested that the jury be sequestered "for the duration of the trial." This motion was denied, and it further appears the jury was not sequestered during deliberations after the cause had been submitted to them. Instead, during recesses and adjournments they were admonished not to discuss the case, express opinions, deliberate further, or read anything about the case. (See § 1122.)

After the jury had returned its verdict as to guilt, but before commencement of the penalty phase, a news article appeared on the front page of the Independent Press-Telegram discussing an allegation that defendant was to be charged with a new double murder in San Luis Obispo. Concerned that some juror or alternate juror may have seen this article, the court questioned each of the jurors individually as to whether any of them had heard or read anything about defendant after returning the verdict of guilt. The contents of the article were not disclosed during this questioning.

Four jurors responded that they had become aware of the article to some degree. One indicated she saw a headline with defendant's name and immediately stopped reading. A second said she saw defendant's picture with a caption, but stopped reading after the caption. A third simply heard there had been something in the news but did not know what it was. A fourth, unfortunately, read the entire article. All other jurors and alternates indicated they had not heard of or read anything about defendant, and they were of course told not to discuss with one another the questions being asked by the court. With defendant's personal waiver, the trial court replaced with alternates the three jurors who had read any part of the article, leaving on the jury only the juror who knew no more than that something had been in the news.

Defendant now claims that the trial court erred in denying his original motion to sequester the jury and that the importance of sequestration was underscored by the incident noted above. He claims error in permitting any of the four jurors who had seen or heard of the article to remain on the jury and in any event claims that the danger of a hidden bias not disclosed on voir dire mandates reversal.

Section 1121 provides: "The jurors sworn to try an action may, in the discretion of the court, be permitted to separate or be kept in charge of a proper officer. Where the jurors are permitted to separate, the court shall properly admonish them. . . ." ■ Sequestration of the jury even during deliberations is therefore a matter within the sound discretion of the trial court. (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 616 [244 Cal.Rptr. 200, 749 P.2d 854]; see also *People* v. *Ayers* (1975) 51 Cal.App.3d 370, 380 [124 Cal.Rptr. 283] [disapproved on other grounds in *In re Misener* (1985) 38 Cal.3d 543, 555, fn. 6 [213 Cal.Rptr. 569, 698 P.2d 637]].) ■ The fact that jurors may be aware that publicity exists in a case does not of itself mean they cannot be fair and impartial. (*People* v. *Manson* (1977) 71 Cal.App.3d 1, 28 [139 Cal.Rptr. 275].)

■ In this case the voir dire of prospective jurors reaffirmed that a fair and impartial trial could be had without sequestration. This jury faced a lengthy trial estimated to be four to six weeks. Clearly the trial judge did not abuse his discretion in denying the motion for sequestration, particularly in its overly broad form.[8]

Nor does subsequent exposure of four jurors to the fact that a news article on defendant had appeared mandate reversal of the guilt or penalty portion of this trial. ■ It is misconduct for jurors to read newspaper articles relating to a trial for which they are sitting as jurors. (*People* v. *Andrews* (1983) 149 Cal.App.3d 358, 363-364 [196 Cal.Rptr. 796, 46 A.L.R.4th 1]; *People* v. *Ladd* (1982) 129 Cal.App.3d 257, 264 [181 Cal.Rptr. 29]; and see *In re Stankewitz* (1985) 40 Cal.3d 391, 397 [220 Cal.Rptr. 382, 708 P.2d 1260].) ■ The trial court quite properly conducted a hearing into whether and to what extent the jury as a whole may have been affected and whether there was good cause to discharge any of the jurors. (Cf. *People* v. *Burgener* (1986) 41 Cal.3d 505, 520 [224 Cal.Rptr. 112, 714 P.2d 1251].)

The results of that hearing rebutted any presumption of prejudice that might have arisen from one juror's misconduct in reading the entire article once it became evident to him that defendant was its subject. The jury had returned its verdict of guilt, had not commenced hearing penalty phase evidence, and had not discussed the contents of the article.

While good cause existed to discharge and replace the juror who had read the article (§ 1123), the trial court acted with solicitude for defendant's

[8]Defendant's reliance on *People* v. *Werwee* (1952) 112 Cal.App.2d 494 [246 P.2d 704], is particularly unhelpful as *Werwee* relates to sequestration rules prior to the 1969 amendment making sequestration discretionary with the trial court even after submission of the cause to the jury. (See Stats. 1969, ch. 520, § 1, p. 1131; and see *In re Winchester* (1960) 53 Cal.2d 528, 534-535 [2 Cal.Rptr. 296, 348 P.2d 904] and *People* v. *Burwell* (1955) 44 Cal.2d 16, 32-33 [279 P.2d 744] [discussing pre-1969 sequestration rules].)

rights. As noted above, with defendant's personal waiver, the three jurors who had so much as seen the article were replaced with alternates.[9] Since jurors at the penalty phase were instructed to consider all the evidence in the case received during any part of the trial, there was also no error in failing to instruct the jury to disregard past deliberations and to begin deliberations anew.[10] Deliberations on the guilt phase of the trial were complete and verdicts of guilt had been returned prior to publication of the news article. Deliberations on the penalty phase had not yet begun. In sum, we find defendant's contentions regarding failure to sequester the jury to be without merit.

## III

*Contention That the Jury Did Not Represent a Fair Cross-section of the Community*

 Defendant contends he was denied his fundamental right to a fair trial since Hispanics were underrepresented in the jury venire from which his jury was drawn. He alleges that his jury was drawn from the Fourth Supervisorial District of Los Angeles County which includes Long Beach and does not represent the ethnic makeup of Los Angeles County as a whole. He asserts that he was entitled to have a jury selected from that larger community.

 The Sixth Amendment provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law. . . ."[11] This presents a "vicinage" requirement that defendant's jury venire not exclude residents of "the judicial district where the crime was committed." (*People* v. *Jones* (1973) 9 Cal.3d 546, 556 [108 Cal.Rptr. 345, 510 P.2d 705]; and see generally *People* v. *Guzman* (1988) 45 Cal.3d 915, 933-935 [248 Cal.Rptr. 467, 755 P.2d 917].) In the present case the crime occurred in Long Beach and our review of voir dire

---

[9] We must reject defendant's assertion that a juror "who knew the content of the article was permitted to remain on the jury." As noted above, one juror simply responded that he knew something had been in the news.

[10] It does not appear that after this incident defendant renewed his request that the jury be sequestered at the penalty phase. Failure to object would of itself normally preclude defendant from contesting the propriety of lack of sequestration. (See *People* v. *Harris* (1977) 73 Cal.App.3d 76, 83 [140 Cal.Rptr. 697]; see generally Annot. (1976) 72 A.L.R.3d 248 (1987 pocket supp.) at §§ 18, 19.)

[11] The Sixth Amendment's provision for jury trial is binding on the states by virtue of the Fourteenth Amendment. (See generally *Duncan* v. *Louisiana* (1968) 391 U.S. 145 [20 L.Ed.2d 491, 88 S.Ct. 1444].)

confirms that prospective jurors included persons from Long Beach. There is thus no conceivable vicinage problem.

 Cases have also noted, however, that a defendant is entitled to trial by a jury drawn from a representative cross-section of the "community." (*O'Hare* v. *Superior Court* (1987) 43 Cal.3d 86, 93 [233 Cal.Rptr. 332, 729 P.2d 766]; *People* v. *Wheeler* (1978) 22 Cal.3d 258, 272 [148 Cal.Rptr. 890, 583 P.2d 748]; and see *Duren* v. *Missouri* (1979) 439 U.S. 357, 359 [58 L.Ed.2d 579, 583-584, 99 S.Ct. 664]; *Taylor* v. *Louisiana* (1975) 419 U.S. 522, 526-529, 538 [42 L.Ed.2d 690, 695-696, 702-703, 95 S.Ct. 692].) While no defendant is entitled to a jury mirroring the demographic composition of the population or necessarily including members of his own group (*Taylor* v. *Louisiana, supra*, 419 U.S. at p. 538 [42 L.Ed.2d at pp. 702-703]; *Wheeler, supra*, 22 Cal.3d at p. 277), he may be able to establish that a particular ethnic group is significantly underrepresented, pointing to a defect in the jury selection process. (*People* v. *Harris* (1984) 36 Cal.3d 36, 48-50 [201 Cal.Rptr. 782, 679 P.2d 433] [plur. opn.].) Defendant makes such a contention here, claiming his jury should have been drawn from a "community" that was countywide and that therefore included a higher proportion of Hispanic individuals.

What constitutes a "community" for purposes of a cross-sectional analysis is a particularly difficult question in Los Angeles County with its population in excess of 7 million people (1980 census) and its geographical area in excess of 4,000 square miles. The issue is pending before us in other cases but for procedural reasons need not be resolved here.

Section 1060 provides: "A challenge to the panel must be taken before a juror is sworn, and must be in writing or be noted by the phonographic reporter, and must plainly and distinctly state the facts constituting the ground of challenge." No such challenge was made in this case, thus preventing the court and counsel from making a suitable record as to the ethnic composition of the jury and at the same time precluding defendant from raising the matter in the present appeal. (Cf. *People* v. *Myers* (1987) 43 Cal.3d 250, 262 [233 Cal.Rptr. 264, 729 P.2d 698] [further defining the timing of a challenge under § 1060].)[12]

---

[12] We have in any event read the voir dire in this case, which extended over 1,700 pages of reporter's transcript. It reveals that 6 of the 111 jurors individually questioned by the court had Spanish surnames. Additionally, two other individuals seeking to be excused from service apparently had Spanish surnames. While use of such surnames to identify persons of Hispanic origin is an imperfect technique (see *People* v. *Trevino* (1985) 39 Cal.3d 667, 686-687 [217 Cal.Rptr. 652, 704 P.2d 719]), it at least suggests that Hispanics were not totally unrepresented in this jury venire. (See also *post,* section XVI, and fn. 37.)

## IV

*Probable Cause to Arrest*

 Defendant contends the trial court improperly denied his motion to suppress evidence, which was based on the theory that the officers who arrested him on February 4, 1981, lacked probable cause. Noting that thereafter police searched defendant's van and residence, defendant contends that the products of those searches should have been suppressed. As noted above, police waited for a search warrant before searching the van and residence. This was not a search incident to arrest. Defendant also contends, however, that the extensive statements later taken from him were the fruit of the allegedly illegal arrest and hence should have been suppressed. We must therefore discuss the arrest's legality.

 Probable cause to arrest exists when facts known to the arresting officers would lead a man of ordinary care and prudence to believe or to entertain a strong suspicion that the person to be arrested has committed a crime. (*People* v. *Martin* (1973) 9 Cal.3d 687, 692 [108 Cal.Rptr. 809, 511 P.2d 1161]; *People* v. *Fein* (1971) 4 Cal.3d 747, 752 [94 Cal.Rptr. 607, 484 P.2d 583].) Each case must be decided on its individual facts, but it is at least clear that the arresting officers must possess more than a mere hunch. They must be able to point to specific and articulable facts which warranted their suspicion that an offense had been committed and that defendant committed it. (*Martin, supra*, 9 Cal.3d at 692.)

 Clearly officers possessed probable cause in this case. They were faced with "signature" crimes—because of the unique nature of each killing, it was reasonable to believe the same person committed them both. Both involved young, nude, blond female victims whose bodies had been dumped, within days of each other, near school grounds in the general area of El Dorado Park. Both victims had been asphyxiated or strangled. While later analysis would identify defendant's tooth pattern, it was evident both had received puncture wounds to the breasts. In both cases pubic hair had been burned and some source of ignition (e.g., matches or cigarette butts) was found at the scene. Again, while later autopsy and forensic work would provide more detail, both bodies showed bloody discharge from anal and vaginal areas suggesting violent sexual assault. Both victims had received a blow to the mouth. Tape residue was found on one body while some actual tape was found at the second crime scene.

Investigation of the Ryan murder produced facts clearly implicating defendant. Officers were told by several of the young people who had been at the pizza parlor that night that defendant had been harassing the women in

general and Ryan in particular. They were told he was inclined to get violent when he did not get his way. They were told of his statements expressing the desire to violently sodomize Ryan. Witnesses said defendant followed the group toward Ryan's house for some distance and that she anticipated he might come to her house that night. They were also told that he had disappeared from the neighborhood for several days after the Bristol killing and that it was unusual for him not to be in the area. They believed that he was acquainted with Bristol as well as Ryan.

Officers knew defendant had a van and that the victims appeared to have been transported to the location where they were found rather than killed there. When police located defendant's van, they saw its carpeting was consistent with the rust-colored carpet fibers they had found at the Ryan crime scene. They also saw greenish or turquoise rubber bands on the gearshift lever, and 23 small turquoise rubber bands had been found near Bristol's body. Again, because of the similarity in the crimes, to implicate the defendant in one killing was to implicate him in both.

Defendant argues there is some confusion regarding physical evidence found at the scene of the crimes. He argues, for example, that there are inconsistencies as to the number of rubber bands. He complains the officer obtaining a search warrant for the van and residence did not indicate the quantity, color, or type of rug fibers he observed and alleges there is confusion over who collected some of the carpet fibers at the Ryan crime scene. Some fibers found in the victims' pubic hair were only recovered after defendant's arrest. And defendant claims the electrician's tape was never linked to him as no such tape was found in his van.

Even assuming arguendo that some details varied, these details in no way diminished the importance of evidence available to police and supporting probable cause to believe that defendant had been involved in these crimes. As for the tape, whether or not tape was found in defendant's van or residence, it served to link the two crimes. Again, because of the similarity of the crimes, if defendant was linked to one, he was implicated in the other.

Defendant disputes the value of some of the testimony of persons present at the pizza parlor the night of the Ryan killing. Thus he says while he was seen following Barr's vehicle as she drove toward Ryan's home, there is no evidence he actually went there. As for Chris Jackson, defendant contends he was an unreliable, untested informant inconsistently described as calm or highly emotional and giving officers conflicting versions of events. First, defendant says Jackson described Ryan and defendant as whispering to each other and defendant holding onto Ryan's hips; then he described defendant as grabbing and pinching Ryan in an obnoxious way. Jackson's

story, defendant complains, lacked essential corroboration without which officers could not act upon it.

It does not matter, however, that witnesses did not see defendant actually arrive at Ryan's house. It suffices for probable cause that he followed for a while, was presumably capable of going to her home, was expected by her, and had expressed an intent to have violent sexual relations with her either that night or the next. As for Jackson, he was no unreliable or anonymous informant providing sketchy information for questionable motives and requiring corroboration. Hence cases relied on by defendant are largely unhelpful on this point. (See e.g., *Fein, supra*, 4 Cal.3d at pp. 752-753; *People v. Gallegos* (1964) 62 Cal.2d 176, 179 [41 Cal.Rptr. 590, 397 P.2d 174]; *People v. Reeves* (1964) 61 Cal.2d 268, 273 [38 Cal.Rptr. 1, 391 P.2d 393].) Jackson was instead a percipient witness to certain events preceding the crime, events which he was able to describe to officers in detail when sought out and questioned by them. (See *People v. Smith* (1976) 17 Cal.3d 845, 850-851 [132 Cal.Rptr. 397, 553 P.2d 557]; *People v. Ramey* (1976) 16 Cal.3d 263, 269 [127 Cal.Rptr. 629, 545 P.2d 1333].)

There is no substantial inconsistency in descriptions of Jackson's demeanor or in the story he recounted such that police would be unable to rely on his information. Not all contact between Ryan and defendant during the evening had to be overtly combative for its significance to be obvious. And Jackson's demeanor when Officer Chastain told him of his friend Ryan's death may certainly differ from his demeanor when speaking to another officer about the crime. In any event, his statements as to defendant's conduct that evening were corroborated by other persons present at the pizza parlor who were separately questioned by police. Any doubts officers may have had were certainly resolved when they saw the carpeting and the rubber bands in defendant's van.

Defendant contends that his statements to police were the product of an illegal arrest and that intervening *Miranda* warnings (*Miranda* v. *Arizona, supra,* 384 U.S. 436) did not attenuate the taint. (See *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 898 [135 Cal.Rptr. 786, 558 P.2d 872]; *People* v. *Ford* (1984) 150 Cal.App.3d 687, 704 [198 Cal.Rptr. 80].) As we conclude there was ample probable cause to arrest defendant both for the murder of Bristol and the murder of Ryan, we need not further discuss this claim.

V

*Sufficiency of Evidence as to Felony Murder*

Defendant contends that the evidence is insufficient to sustain a first degree murder conviction on a theory of felony murder. First, he claims

there was no rape of either victim and no sodomy of Ryan as all such sexual conduct was voluntary.[13] Even if there was an adequate showing of rape and sodomy, however, he contends that his evidence of voluntary intoxication negated any specific intent to commit rape or sodomy and hence precluded a finding of felony murder in the commission of those crimes.[14] Finally, he urges that even if a specific intent to rape could be shown, evidence fails to establish that the death of the victims occurred during the commission or as a result of the alleged rapes. These claims utterly lack merit.

## A. *Sufficiency of Evidence of Rape and Sodomy*

Rape involves intercourse that is nonconsensual either because consent is not given, is coerced, or is unavailing for one of the reasons specified in subdivisions of section 261.[15] ▆▆ It is thus subject to a defense of consent. We have also recognized there is a defense of mistake of fact where a defendant alleges he had a good faith, reasonable belief that the victim voluntarily consented to engage in sexual intercourse. (*People* v. *Mayberry* (1975) 15 Cal.3d 143, 155-157 [125 Cal.Rptr. 745, 542 P.2d 1337]; see also *People* v. *Rhoades* (1987) 193 Cal.App.3d 1362, 1367-1369 [238 Cal.Rptr. 909]; *People* v. *Castillo* (1987) 193 Cal.App.3d 119, 124 [238 Cal.Rptr. 207]; *People* v. *Burnham* (1986) 176 Cal.App.3d 1134, 1140-1141 [222 Cal.Rptr. 630].) ▆▆ ▆▆ ▆▆ ▆▆ ▆▆ Defendant's first claim is that he did not commit rape or, as to Ryan, sodomy,[16] since both victims consented to sexual conduct.[17]

As the Attorney General argues, defendant can only make this extraordinary assertion by focusing exclusively on his taped admissions to police (admitted into evidence as exhibits 111-A through 111-R and 112) and ignoring most of the evidence in the case. As to Bristol, evidence showed

[13] He appears to concede that anal sex with Bristol was nonconsensual.

[14] As the jury was instructed, an unlawful killing during the commission of or attempt to commit rape is first degree felony murder while an unlawful killing during the commission of or attempt to commit sodomy would be a felony murder in the second degree. (§ 189.)

[15] Section 261, subdivision (2), violation of which defendant was convicted, provides: "Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances: . . . (2) Where it is accomplished against a person's will by means of force, violence, or fear of immediate and unlawful bodily injury on the person of another."

[16] Sodomy is described as "sexual conduct consisting of contact between the penis of one person and the anus of another person." (§ 286, subd. (a).) It too is a general intent crime. (See *People* v. *Thornton* (1974) 11 Cal.3d 738, 765 [114 Cal.Rptr. 467, 523 P.2d 267].) In the present case, it was alleged that such act was "accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim. . . ." (§ 286, subd. (c).)

[17] The jury was instructed under CALJIC Nos. 3.30, 10.00, and 10.50 on rape and sodomy as general intent crimes. They were also instructed on theories of consent and on reasonable and good faith belief as to consent. (See CALJIC Nos. 10.23 and 10.50.1.)

her wrists and ankles had been bound so tightly that there were ligature marks on the skin and hemorrhage in the underlying tissues. She had been struck in the mouth and had what was described as a defense wound on one hand. It also appeared lacerations of the anus and vagina were premortem.

Defendant focuses on his contention that she had opportunities to leave his van and said she would "do anything" rather than be left where defendant tried to abandon her, and he emphasizes that in his statement he indicated intercourse thereafter was voluntary. But he ignores other implications in that same statement in which he said: ". . . I hit her, and I dragged her out of my van, and then she told me that she'd do anything, and I thought about that for a minute, and—I don't know it was just that I was drunk and I was in a weird mood, and I just took her and I threw her in the back and told her to get in the back, and then I told her to get out and get in the front. . . ." After parking at a new location: ". . . I told Edna to get in the back,[18] and we both got in the back; told her to take off her clothes, she did, she was willing and sat there, had sexual intercourse once, then I was getting up and getting ready to let her go, and I didn't really have her—you know—forcibly. I guess maybe she thought I did, but I don't know—you know."[19]

Similarly, physical evidence and defendant's own admissions regarding Ryan provide ample evidence that sexual intercourse and sodomy were nonconsensual. With Ryan as well, most injuries were premortem. She too had been punched and strangled and manifested the same unusual damage to anus and vagina as in the Bristol case. Additionally, however, we had evidence from people at the pizza parlor the night of the killing regarding her rejection of defendant's advances and defendant's statements to Chris Jackson that he wanted to have violent sex with her. As for defendant's statements that she "submitted freely" and that "this wasn't the first time" they had had sex, defendant also admitted "she was sort of hesitant at first, and then I got mad, and then she said oh, okay, cuz I pushed her arms back, and I was just going to stick my hand down her pants and start playing with her at first, and then—uh—she said oh, okay I'll do it on my own. . . ."

To determine sufficiency of the evidence, one examines whether a rational trier of fact could find defendant guilty beyond a reasonable doubt. In this process one must view the evidence in the light most favorable to the judgment and presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. To be sufficient,

---

[18] As the Attorney General notes, officers determined there was no way to exit the van except through the driver's door.

[19] In his statement defendant thereafter described how, when Bristol began to scream, he taped her mouth, wrists, and ankles and violently sodomized her.

evidence of each of the essential elements of the crime must be substantial and one must resolve the question of sufficiency in light of the record as a whole. *(People v. Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110]; *People v. Johnson* (1980) 26 Cal.3d 557, 576-578 [162 Cal. Rptr 431, 606 P.2d 738, 16 A.L.R.4th 1255]; *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781].)

■ We have no hesitancy in concluding that there was ample evidence before the jury justifying its finding that sexual intercourse and anal penetration in this case were nonconsensual as to both victims and that defendant had no reasonable belief in his victims' consent. The jury was certainly not bound to honor defendant's characterization of the events and, as noted, even those admissions contained sufficient ambiguity regarding the consent of the victims to justify the jury's conclusions.

## B. *Sufficiency of Evidence as to Specific Intent to Rape*

■ As noted above, defendant next contends that even if there is sufficient evidence of rape and sodomy, his evidence of intoxication from the combined effects of alcohol and marijuana negated any possible specific intent to rape or sodomize and hence precluded a finding of felony murder. ■ We have required as part of the felony-murder doctrine that the jury find the perpetrator had the specific intent to commit one of the enumerated felonies, even where that felony is a crime such as rape. *(People v. Mosher* (1969) 1 Cal.3d 379, 392 [82 Cal.Rptr. 379, 461 P.2d 659]; *People v. Fain* (1969) 70 Cal.2d 588, 599 [75 Cal.Rptr. 633, 451 P.2d 65]; *People v. Anderson* (1968) 70 Cal.2d 15, 34 [73 Cal.Rptr. 550, 447 P.2d 942].)[20]

■ While there was evidence of his intoxication on the night of the Ryan killing, we cannot conclude his evidence was so overwhelming that the jury could not conclude he retained the capacity to intend to rape and sodomize his victims.[21] Defendant did establish that he had been drinking and smoking marijuana that night and that he may have been unsteady on his feet. He also alleged that at the time of the Bristol killing he had been drinking so much that he was weaving as he drove his van. His expert witness concluded he was an alcoholic who would have impaired judgment as to whether someone was sexually receptive or not, particularly if he were actually drinking at the time. But that expert also concluded that even while

---

[20] Pursuant to CALJIC Nos. 8.21 and 8.32, the jury was instructed that to find felony murder in the commission of rape or sodomy, it would have to find, beyond a reasonable doubt, that defendant harbored the specific intent to commit those offenses.

[21] As these offenses occurred prior to January 1, 1982, defendant was entitled to and received diminished capacity instructions. (See § 22, amended by Stats. 1981, ch. 404, § 2, p. 1592.)

drinking, an alcoholic on a particular occasion might be capable of intending to have intercourse against someone's will; and in any event, given the limited contact of the expert with this defendant, the jury was entitled to weigh his opinion against the evidence of intent to be gained from the events of the evening and the physical evidence it produced.

While biting the nipples and burning the pubic hair may simply show brutal perversion, punching the victims, taping them, and attacking them in the back of his van from which there was no exit supports an intent to have intercourse against the victims' will. The jury was certainly not bound to accept defendant's self-serving statements as to the victims' willingness to engage in sexual activity.

Defendant contends that we may not distinguish the facts of the present case from the facts in *Anderson, supra*, 70 Cal.2d 15, *People* v. *Craig* (1957) 49 Cal.2d 313 [316 P.2d 947], and *People* v. *Granados* (1957) 49 Cal.2d 490 [319 P.2d 346], in each of which evidence was found insufficient to sustain a conviction of felony murder on a theory of rape or violation of section 288. Each case, however, is readily distinguishable.

While in each of those cases the condition of the body might have suggested some sexual motive in the killing, no evidence supporting more than a strong suspicion thereof was adduced. Hence in *Anderson* there was no evidence the defendant had ever formed any lewd or sexual feelings toward the victim, and a laceration in the vaginal area appeared to be only one of several randomly inflicted wounds. (*Anderson, supra*, 70 Cal.2d at pp. 34-35.) In *Granados*, while defendant had asked the victim whether she was a virgin and, when her body was found, her skirt was above her private parts, there was no evidence of contusion or laceration of her private parts or evidence of spermatozoa. (*Granados, supra*, 49 Cal.2d at p. 497.) Finally in *Craig*, while the victim's nightgown and panties were torn open exposing the front of her body, her legs were apart, and defendant had said he would like "a little loving," there remained no certain evidence of rape. There was instead evidence he had intentionally "beat up a woman," strangled her, and dragged the body some 20 to 25 feet. (*Craig, supra*, 49 Cal.2d at pp. 316-319.)

Here contusions, lacerations, and other physical evidence indicate actual rape and sodomy. There is also evidence of defendant's sexual intentions both in his own statements and from the observations of others as to the Ryan incident. Evidence of specific intent to rape and sodomize is ample and we conclude that defendant's contention regarding sufficiency of evidence for felony murder lacks merit.

### C. Murder "in the Commission of" Rape or Sodomy

 Finally defendant cites us to that portion of *Anderson* which states: "Additionally, the evidence must establish that the defendant harbored the felonious intent either prior to or during the commission of the acts which resulted in the victim's death; evidence which establishes that the defendant formed the intent only after engaging in the fatal acts cannot support a verdict of first degree murder based on section 189. [citation omitted.]" (70 Cal.2d at p. 34.) He urges that even if there was intent to rape, the rapes and the intent to rape were over at the time of the homicide.

 As we have stated, however, in discussing the special circumstance of felony murder, determining whether a killing had occurred in the commission of a felony is not "a matter of semantics or simple chronology." (*People* v. *Green* (1980) 27 Cal.3d 1, 60 [164 Cal.Rptr. 1, 609 P.2d 468].) Defendant's strict construction of the temporal relationship between the rape or sodomy and the killing would preclude a felony-murder conviction or special circumstance in any case save where the victim died in the very midst of the sexual assault. Instead the focus is on the relationship between the underlying felony and the killing and whether the felony is merely incidental to the killing, an afterthought. (*Green, supra,* 27 Cal.3d at pp. 60-61; *People* v. *Thompson* (1980) 27 Cal.3d 303, 321-325 [165 Cal.Rptr. 289, 611 P.2d 883]; and see *People* v. *Kimble* (1988) 44 Cal.3d 480, 500-501 [244 Cal.Rptr. 148, 749 P.2d 803].)

 Here clearly the killings occurred when the victims screamed and struggled to get away. They occurred as a direct product of the sexual assaults and to silence the victims; and the sexual offenses were not incidental events or afterthoughts. This final aspect of defendant's sufficiency-of-evidence challenge to his convictions for rape, sodomy, and felony murder therefore lacks merit.

## VI

### Sufficiency of Evidence as to Premeditated Murder

 Defendant contends there was insufficient evidence of a wilful, deliberate and premeditated murder or even of an intentional killing in this case. He asserts the encounters with the victims were completely unplanned and there was no preexisting reflection involved in the killings. They occurred spontaneously when the victims suddenly began to kick and scream, and defendant simply sought to "quiet" the victims, not realizing they were asphyxiating. He argues again that his voluntary intoxication on the nights of the killings negated any ability to maturely and meaningfully reflect on

the gravity of his acts.[22] Defendant further argues that since evidence of premeditation is insufficient and since one cannot tell the theory on which the jury relied, his first degree murder convictions must be reversed. (*Green, supra*, 27 Cal.3d at pp. 69-70.)

 While evidence of a premeditated murder was less adequate than evidence that the killings were done in the commission of rape and sodomy, we conclude that evidence of premeditated murder was sufficient to go to the jury, and in any event the verdict indicates that a felony-murder theory was relied on.

We must first reject defendant's repeated characterization of the facts of these killings as involving his attempt to "quiet" each of his victims by holding a cloth over her mouth. Evidence supported a finding not just of suffocation but of strangulation, and as we have previously noted, this method of killing is indicative of at least a deliberate intent to kill. (*People* v. *Frank* (1985) 38 Cal.3d 711, 733-734 [214 Cal.Rptr. 801, 700 P.2d 415]; *People* v. *Rowland* (1982) 134 Cal.App.3d 1, 9 [184 Cal.Rptr. 346].)

It is true, however, that evidence of premeditation and deliberation was not great. We noted in *Anderson,* supra, 70 Cal.2d 15, that evidence of premeditation and deliberation fell into three basic categories: "(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a preexisting reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation omitted]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Anderson, supra*, 70 Cal.2d at pp. 26-27

---

[22] Section 189 has since been amended to provide: ". . . To prove the killing was 'deliberate and premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act." (Stats. 1981, ch. 404, § 7, p. 1593.)

(italics in original); see also *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1018 [245 Cal.Rptr. 185, 750 P.2d 1342]; *People* v. *Hovey* (1988) 44 Cal.3d 543, 556 [244 Cal.Rptr. 121, 749 P.2d 776]; *People* v. *Wright* (1985) 39 Cal.3d 576, 592 [217 Cal.Rptr. 212, 703 P.2d 1106].)

▉▉▉▉ Evidence of planning in this case is admittedly slim particularly with respect to the Bristol killing. Although there was some evidence defendant may have been acquainted with Bristol, he did apparently encounter her when she was hitchhiking on the night of the killing. His encounter with Ryan was also by chance in that he did not at first seek her out to kill her but instead met her in the park and at the pizza parlor with a group of mutual friends. We have remarked, however, that the reflection necessary for premeditation and deliberation is not measured solely by duration of time. (*Wright, supra*, 39 Cal.3d at p. 593.) As noted above, his van provided no chance for escape once someone was inside. He was in a violent mood on the night of the Bristol killing, admitting in his statement to police that he had set out to beat up a homosexual. Likewise on the night of the Ryan killing he expressed the intent to violently sexually assault Ryan. Given that state of mind and given that the victims were taped and strangled, a jury might infer that the killings were planned even though the time for reflection was slight. (Cf. *Lucero, supra*, 44 Cal.3d at p. 1019.)

Evidence of motive is clearly present. Both victims were killed in connection with sexual assaults when they screamed and fought violently. The jury might reasonably infer they were killed to silence them and conceal the crime. Further, given the assaults with the baseball bat, biting the victims' breasts, and burning their pubic hair, the jury might even infer that strangulation was sexually motivated, a part of the total abuse of the victims in this case. (See *People* v. *Robertson* (1982) 33 Cal.3d 21, 49 [188 Cal.Rptr. 77, 655 P.2d 279].)

Finally, the manner of killing does not necessarily establish a sudden explosion of violence rather than a calculated killing. (See *People* v. *Alcala* (1984) 36 Cal.3d 604, 626 [205 Cal.Rptr. 775, 685 P.2d 1126].) Again the injuries to the body carried significant sexual overtones. This was not a case of random stabbings or bludgeoning but of specifically sexual violence repeated in almost every detail with both victims.

Defendant argues that his expert evidence on voluntary intoxication and his testimony as to his state of intoxication from alcohol and marijuana on the nights of the killings establish that he could not have premeditated and deliberated in the case of either killing; but the jury was certainly entitled to conclude otherwise. As the Attorney General notes, the only evidence of his intoxication on the night of the Bristol killing is defendant's own claim to

that effect. And while he did establish he had been drinking and smoking marijuana on the night of the Ryan murder, his own expert conceded it was possible even for an alcoholic while drinking to form the specific intent to kill.

It was up to the jury, which was instructed on the diminished capacity defense, to determine whether on the night of the crimes defendant actually had the intent to kill and had premeditated these killings. He had presented only the possibility that his capacity to do so was diminished. We therefore conclude that there was sufficient evidence to permit a reasonable trier of fact to conclude the prosecution sustained its burden of proof on a theory of wilful, deliberate, and premeditated murder. (*Lucero, supra*, 44 Cal.3d at p. 1018; *People* v. *Arcega* (1982) 32 Cal.3d 504, 518 [186 Cal.Rptr. 94, 651 P.2d 338]; *Johnson, supra*, 26 Cal.3d at p. 576.)

■■■ Finally, we can tell in this case that the jury did not return their first degree murder verdict solely on a premeditation theory. As the Attorney General notes, even though the verdict forms for murder do not indicate the theory relied on, the jury also found true the special circumstance allegations that the murder of each victim was committed while defendant was engaged in the commission of rape and sodomy.

Defendant objects that the special circumstance finding is not the "equivalent" of a finding of felony murder since the special circumstance finding does not necessarily require specific intent to rape but only that the killing occur during the commission of rape. It does not matter, however, whether or not the two are "equivalent." We are not curing a defect in a felony-murder instruction with a special circumstance finding. We are simply trying to "determine from the record on which theory the ensuing general verdict of guilt rested. . . ." (*Green, supra*, 27 Cal.3d at p. 69.) The special circumstance findings adequately serve that purpose.[23]

## VII

*Propriety of Instructing the Jury Pursuant to CALJIC No. 8.75*

■■■ Pursuant to CALJIC No. 8.75 (1982 New), the jury was instructed as to how to proceed with respect to charges of first and second degree

---

[23] We may distinguish this case from *People* v. *Hayes* (1985) 38 Cal.3d 780 [214 Cal.Rptr. 652, 699 P.2d 1259], where the prosecutor repeatedly stressed the felony-murder theory on which the jury, under then-existing law, had not been properly instructed. We could not there rely on the fact that the jury had been properly instructed on a theory of murder by premeditation and deliberation absent any indication the jury had actually relied on that theory. (*Id.* at p. 787.)

murder and lesser included offenses of voluntary and involuntary manslaughter.[24] Defendant urges that this instruction infringed on the jury's deliberative process in a way tending to produce higher verdicts. He also urges that the instruction infringed on the jury's power by telling the jury it could not return a verdict on a lesser included offense if it was unable to agree as to the greater.

We considered instructions patterned on CALJIC No. 8.75 and on our decision in *Stone* v. *Superior Court* (1982) 31 Cal.3d 503 [183 Cal.Rptr. 647, 646 P.2d 809], in our recent decision in *People* v. *Kurtzman* (1988) 46 Cal.3d 322 [250 Cal.Rptr. 244, 758 P.2d 572]. We concluded that a jury should be restricted only from returning a verdict on, not from considering or deliberating on, a lesser included offense before acquitting of the greater offense. It should otherwise be free to consider charges in any order it feels conducive to fruitful deliberations. (*Id.* at p. 330.) We recognized that CALJIC No. 8.75 contained ambiguous language subject to misinterpretation in this regard. (*Id.* at p. 336.) There is no indication, however, that such a misunderstanding of the law infected jury deliberations in this case.

In the first place, this jury deliberation did not involve apparent deadlock. The jury retired to deliberate on the afternoon of April 20, 1983, continued deliberations on April 21 and 22, and after a weekend break, resumed deliberations April 25, returning a verdict before noon. The verdict forms show that by their second day of deliberations, the jury had agreed defendant was guilty of first degree murder, rape, and sodomy as to Bristol. On their last day, they concluded he was guilty of first degree murder, rape, and sodomy as to Ryan, and they found true the alleged special circumstances as to each victim.

There is no indication of disagreement or deadlock, no request to the court for further instructions or the rereading of particular testimony. If our

---

[24] The instruction provided in pertinent part: ". . . You should determine whether a defendant is guilty or not guilty of the offense of first degree murder charged in Counts I and IV and any special finding you are directed to make. If you unanimously agree that defendant is guilty of said offenses . . . you will have your foreman date and sign the guilty verdict and return with it into court. Nothing further will be required of you as to Counts I and IV.

"If you unanimously agree that defendant is not guilty of murder in the first degree, you will have your foreman date and sign the not guilty verdict of the offense of murder in the first degree and you will determine whether defendant is guilty or not guilty of murder in the second degree. . . .

"You will note from this instruction that you must unanimously agree that the defendant is not guilty of first degree murder before you may find defendant guilty or not guilty of second degree murder. If you are unable to unanimously agree on the charge of first degree murder, your foreman shall report such facts to the court. If you are unable to unanimously agree on the charge of second degree murder, your foreman shall reports such facts to the court.

"You must unanimously agree the defendant is not guilty of second degree murder before you find him guilty or not guilty of voluntary or involuntary manslaughter. . . ."

concern in *Stone v. Superior Court, supra*, 31 Cal.3d 503, was to permit the return of partial verdicts where appropriate, that concern does not appear to be called into play on this record; and the suggestion the jury might have reached a different result had it been permitted to consider all degrees of homicide appears based on mere speculation.

Secondly, defendant requested that CALJIC No. 8.75 be given and should not now be heard to complain that the court acceded to his request.[25] We may review the validity of an instruction initially requested by the defense where counsel's actions in seeking or not objecting to the instruction constitutes simply neglect or mistake. (§ 1259; *People v. Barraza* (1979) 23 Cal.3d 675, 683-684 [153 Cal.Rptr. 459, 591 P.2d 947].) The trial court does have a duty to correctly instruct the jury on principles of law relevant to issues raised by the evidence in a criminal case. We have recognized, however, that defendant may not be entitled to challenge a requested instruction where the record clearly reflects that counsel had a deliberate tactical purpose in requesting it. (*People v. Avalos* (1984) 37 Cal.3d 216, 228-229 [207 Cal.Rptr. 549, 689 P.2d 121]; *People v. Wickersham* (1982) 32 Cal.3d 307, 330-335 [185 Cal.Rptr. 436, 650 P.2d 311].)

 The record here supports the conclusion that requesting CALJIC No. 8.75 was not negligence, inadvertence, or mistake. Defense counsel, as well as the prosecutor, in closing arguments to the jury, discussed the CALJIC No. 8.75 procedure for returning verdicts. Scarcely mentioning voluntary or involuntary manslaughter, defense counsel argued that defendant should be acquitted of first degree murder based on evidence of intoxication and the alleged consensual nature of sexual intercourse with the victims. The whole goal of his argument was to persuade the jurors to turn their attention to and reject first degree murder and hence any special circumstance finding at the outset, even if they were to go on to conclude that the sodomies were nonconsensual and that defendant was therefore at least guilty of second degree murder. It takes no tenuous inference from the record to perceive defendant's tactical purpose. Hence both due to the actual progress of deliberations in this case and due to invited "error" in requesting CALJIC No. 8.75, we decline to further consider defendant's speculations concerning the effect of CALJIC No. 8.75.

---

[25] Defendant also requested and the court gave CALJIC No. 17.10 informing the jury that if it *unanimously* had a reasonable doubt as to murder, it could convict him of voluntary or involuntary manslaughter.

## VIII

### *Failure to Instruct That Special Circumstances Require Intent to Kill*

Pursuant to CALJIC No. 8.21, the jury was instructed that it could find defendant guilty of first degree felony murder if it found defendant had committed the unlawful killing of a human being, whether intentional, unintentional or accidental, during the commission of or attempt to commit a rape and had had the specific intent to commit the rape. The jury was further instructed pursuant to CALJIC No. 8.81.17 that it could find true special circumstances of murder in the commission of rape or sodomy if it found the murder was committed while defendant was engaged in the commission of or attempt to commit such crimes and was perpetrated in order to carry out or advance those crimes rather than being merely incidental thereto.

■ Defendant argues that the jury could therefore have found him guilty of first degree murder with special circumstances without necessarily finding that he had the intent to kill. However, in *People v. Anderson, supra*, 43 Cal.3d 1104, we held that an instruction requiring the jury to find intent to kill in connection with a felony-murder special circumstance is only required where there is evidence that defendant was an accomplice rather than the actual killer. (*Id.* at pp. 1147-1148; see also *People v. Gates* (1987) 43 Cal.3d 1168, 1193 [240 Cal.Rptr. 666, 743 P.2d 301].) In the present case defendant was admittedly the actual killer, and hence no instruction on intent to kill was required.[26]

### PENALTY PHASE

### FACTS

The prosecution presented no additional evidence at the penalty phase. Through the testimony of relatives and friends, two psychologists, and the defendant himself, the defense urged that the death penalty should not be imposed since at the time of these crimes defendant was young, drunk, and the product of an awful home.

Defendant's adoptive mother, adoptive father, and other relatives described the household in which defendant had been raised. When he was about six years old, defendant's adoptive mother had a nervous breakdown

---

[26] Defendant argues that our decision in *Anderson* should not be applied retroactively. We resolved this issue against him in *People v. Poggi* (1988) 45 Cal.3d 306, 326-327 [246 Cal.Rptr. 886, 753 P.2d 1082].

and for roughly the next eight years was hospitalized repeatedly for severe depression punctuated by suicide attempts. She suffered from hallucinations, exhibited a variety of bizarre, even violent behavior, and ultimately obtained a divorce and left defendant with his adoptive father.

The father gave defendant little discipline, blamed defendant's increasing physical disruptiveness on alleged racial discrimination, and claimed police, school officials, and everyone was just harassing his son. Defendant therefore grew more confused, upset, and angry, striking back physically rather than verbally if he felt bullied.

Defendant's former girlfriend testified he had never exhibited tendencies toward abnormal sex and had only once been violent with her.[27] An acquaintance who knew him from the group of young people at El Dorado Park attested to his efforts to persuade her to give up smoking and drinking because of her diabetic condition.[28]

Two psychologists, Dr. Michael Maloney and Dr. Faye Girsh, testified to the results of interviewing defendant and his relatives, putting defendant through various psychological tests, and reviewing school records and reports on defendant's past behavior. Defendant was portrayed as emotionally disturbed, perhaps exhibiting a borderline personality disorder. This manifested itself in self-destructive behavior including substance abuse. He was, however, described as being of average intelligence and not psychotic. His tendency from childhood to resort to violence had caused him to be in trouble with the law from the age of 12 or 13.[29] But the psychologists suggested it was possible defendant would do well in the highly structured setting of a prison, whether or not rehabilitative programs could be successful. Defendant also put on the testimony of an inmate at Folsom Prison to describe the rigors of prison existence to which defendant would be subject for the rest of his life if the death penalty were not imposed.

Finally, defendant testified on his own behalf and expressed remorse for the deaths of Bristol and Ryan. He reiterated the basic elements of his guilt phase defense—that sexual intercourse with Bristol and sexual intercourse and sodomy with Ryan were consensual and that he only meant to "quiet"

---

[27] She blamed herself for the incident, claiming defendant slapped her only after she hit him with a pipe.

[28] On cross-examination the prosecutor elicited the fact that this young woman had been maintaining a somewhat affectionate correspondence with defendant during his incarceration.

[29] Anticipating defendant's taking the stand, the defense successfully moved under *People v. Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], for a ruling that his prior burglary conviction could not be used for impeachment.

the young women when they screamed, struck him, or called him names. He stated, "I guess I just held on too long."

Defendant's testimony reaffirmed, however, details indicating sex with Bristol was not consensual. Thus he admitted he slapped her and dragged her from the van whereupon "she told me don't hurt her, she'd do anything." And prior to picking her up hitchhiking, he admitted to beating a homosexual (at a location, coincidentally, only blocks from the courthouse) for no particularly good reason at all.

Relentlessly cross-examined about details of the crimes, defendant suddenly could not remember. He could not remember what he did with the victims' clothing. Asked if he had shoved a baseball bat into the vagina and rectum of each victim, his response was that he could not "recall." Nor could he recall biting Ryan's breasts. And he only thought he "may have" burned Ryan's pubic hair.

DISCUSSION

IX

*Prosecutor's Argument Regarding Multiple-murder Special Circumstances, Dual Use of Underlying Crimes*

Some error arose from the prosecutor's argument with respect to multiple-murder special circumstances and factors (a) and (b). (See CALJIC No. 8.84.1.1; § 190.3, factors (a), (b).)[30] Prompt objection and proper admonition could have cured any harm, but such objection was not made. (See *Green, supra,* 27 Cal.3d at pp. 27, 34.) In any event, reversal is not required.

The jury in this case found true as to each victim a multiple-murder special circumstance, a rape special circumstance, and a sodomy special circumstance. Further, in his argument at the penalty phase, the prosecutor said: "Consider not only the facts of the case, but the circumstances that were found to be true, the special circumstances, not just the other circumstances. . . . [¶] A person who commits a murder, for example, during the course of a robbery, could be subject to the death penalty, and a variety of other conditions of taking a life under certain conditions subjects a person to the death penalty. Those are called special circumstances. . . . [¶] In here, we have, as to each murder, three—you have multiple murders, you

---

[30] References hereafter to various "factors" are to the factors on which the jury was instructed. Where reference to section 190.3, the source of those instructions, is intended, it will be so indicated.

have rape and you have sodomy. Those were found by the jury to be true. You may have others, but those are three definite ones as to each. . . . [¶] You consider acts of violence or implied violence, you consider the various events or acts of events of violence. They are demonstrated by his convictions for these felony charges. There are six of them."

## A. Excessive Multiple-murder Special Circumstances

■ It was error on the facts of this case to find true more than one multiple-murder special circumstance. (*People* v. *Williams* (1988) 44 Cal.3d 883, 950 [245 Cal.Rptr. 336, 751 P.2d 395]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1273 [232 Cal.Rptr. 849, 729 P.2d 115]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 787 [230 Cal.Rptr. 667, 726 P.2d 113].) The question is whether defendant suffered any prejudice from the reference to two multiple-murder special circumstances instead of one. (See *Williams, supra,* 44 Cal.3d at p. 951; *Rodriguez, supra,* 42 Cal.3d at pp. 787-788; *Allen, supra,* 42 Cal.3d at pp. 1281-1283.) We conclude he clearly did not. The jury was not told to mechanically count up aggravating factors. It was not confused as to the number of victims. It is inconceivable that finding true one more multiple-murder special circumstance than was strictly correct had any influence on the outcome of the deliberations at the penalty phase.

## B. Double Counting of Special Circumstances

■ A second issue arises from the fact that the jury found true special circumstances of rape-murder and sodomy-murder as to each victim. Additionally those special circumstances were, under factor (a), considered as aggravating factors. Based on section 190.3, factor (a), the jury was instructed to consider: "The circumstances of the crime with which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true." The prosecutor's remarks invited the jury to consider not only "the facts of the case" which included rape and sodomy, but also the fact that those offenses were special circumstances. The issue is whether this situation improperly permitted excessive counting of special circumstances, either by the number of felony-murder special circumstances alleged as to each victim or their consideration under factor (a).

We recently discussed and resolved these issues in *People* v. *Melton* (1988) 44 Cal.3d 713 [244 Cal.Rptr. 867, 750 P.2d 741]. We rejected the position, which had been supported by the plurality opinion in *Harris, supra,* 36 Cal.3d 36, that there was any statutory or constitutional impediment to the jury considering as special circumstances the various felonies which were part of the indivisible course of conduct involving the murder.

(*Melton, supra*, 44 Cal.3d at pp. 763-768; and see *Harris, supra*, 36 Cal.3d at pp. 64-66.)[31] We also noted that while there might in theory be a problem with considering such felonies both as circumstances of the murder and as special circumstances, the possibility of real prejudice was remote. (*Melton, supra*, 44 Cal.3d at pp. 768-769.)

We conclude the potential for prejudice was not realized here. The jury was fully aware of the facts and, again, was not instructed to weigh aggravating factors in some mechanical way.

### C. *Dual Use of Underlying Crimes*

■ Finally, a related but slightly more troublesome problem is the fact that the prosecutor suggested the jury could consider the crimes of which defendant had been convicted in this case not only under factor (a) but also as acts of violence under factor (b). (See § 190.3, factor (b).) The jury had been instructed that they might consider: "The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence." Defendant asserts that the prosecutor's argument not only proposed additional, improper aggravating factors, it deprived him of a mitigating factor, namely the absence of other violent criminal activity.

Factor (b) only pertains to criminal activity *other than* the crimes for which defendant is convicted in the present proceeding. (*Kimble, supra*, 44 Cal.3d at p. 505; *People* v. *Miranda* (1987) 44 Cal.3d 57, 106 [241 Cal.Rptr. 594, 744 P.2d 1127].) It was therefore error for the prosecutor to suggest that the two murders, two rapes, and two sodomies should be considered not only in analyzing the circumstances of the crime but also as violent criminal activity under factor (b).

We conclude nevertheless that this error was harmless not only in light of the brevity of the reference and the other arguments of both counsel, but also in light of the fact that the prosecutor himself, in his final remarks to the jury, chose to emphasize that aggravating factors are not counted up and compared to the score for mitigating factors. He stressed that the jury must consider instead the "quality" of the various factors and determine whether defendant is "the type of person that should be given life without parole or the death penalty."

---

[31] The United States Supreme Court has also recently held that a capital sentencing scheme which permits the jury to consider as an aggravating circumstance a fact which is also an element of the crime of which defendant has been convicted is not constitutionally infirm. (*Lowenfield* v. *Phelps* (1988) 484 U.S. 231, __ [98 L.Ed.2d 568, 582-583, 108 S.Ct. 546, 555].)

Defendant argues that the prosecutor's remarks deprived him of a mitigating factor, namely, the absence of other criminal activity involving violence. We said in *Lucero, supra*, 44 Cal.3d 1006, that where a defendant had no prior criminal record, improper overlap of factors (a) and (b) could have the effect of eliminating a legitimate mitigating factor. (*Id.* at p. 1031, fn. 15.) Here, however, defendant himself, as part of the description of his disturbed childhood, presented his tendency to resort to violence. It is thus highly unlikely that the prosecutor's comments foreclosed the defense from any argument based on the lack of violent crimes in defendant's record. We find no reasonable possibility that the prosecutor's brief remarks could have prejudiced the defense.

## X

### *Prosecutor's Argument Regarding Factors (d) and (h)*

Defendant claims the prosecutor warned the jury it should not consider mitigating evidence regarding his intoxication or psychological problems unless the impairment was so severe as to amount to insanity or diminished capacity. He urges this is not consistent with factors (d) and (h)[32] and violates the principle that the jury must be allowed to consider any aspect of defendant's character or background relevant to penalty. (Cf. *People* v. *Ghent* (1987) 43 Cal.3d 739, 776 [239 Cal.Rptr. 82, 739 P.2d 1250].)

In paraphrasing several factors, the prosecutor did add to the list: "Whether or not he had the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law; whether or not it was impaired as a result of mental disease or defect or the effects of intoxication." This is, roughly speaking, factor (h). The prosecutor rambled on: "And in regards to that, you have the testimony, both during the trial and the penalty phase of the trial, the guilty phase and the penalty phase, as to the degree of intoxication; the degree of whatever emotional disturbance, albeit a psychologist, although it was not a mental disease or psychosis does not excuse the criminal conduct, as it might in some cases.

"—Whether or not it is such that it would impair his ability to appreciate the criminality of his conduct or to conform to the requirements of law.

---

[32] Section 190.3 provides, as factors to take into account in determining penalty: "(d) Whether or not the offense was conmitted while the defendant was under the influence of extreme mental or emotional disturbance" and "(h) whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the effects of intoxication."

"You recall that Dr. Maloney testified, on direct, that given his background and whatever you want to call his condition, he was responsible for his conduct. He may have been drinking.

"What was the effect of that drinking? In deciding that, was it such that he did not know what he was doing? That he was out of his mind? That he just couldn't conform his conduct? Or was it such that he had been drinking, but he was responsible and he knew what he was doing?"

We just cannot agree with defendant that this portion of the argument somehow prevented the jury from *considering* relevant mitigating factors. The prosecutor himself went on to consider such factors, stating that defendant's behavior was certainly not "normal" but it was "within that degree of normalcy where we say his conduct is not excused. . . ." He discussed defendant's disturbed childhood, arguing it did not merit lesser punishment. Thus, rather than telling the jury to ignore this mitigating evidence, the prosecutor addressed it.

Defense counsel also discussed defendant's childhood resulting in mental and emotional damage and he discussed defendant's impairment with either alcohol or drugs. He admitted these did not amount to a legal excuse and that if they had, he would have raised a defense such as insanity. But nevertheless, it was a mitigating factor the jury should consider in imposing penalty. "What I am saying is that he is, nevertheless, severely and substantially emotionally and mentally impaired, and that what we don't do in this country is we don't kill people who are sick people. We just don't do it."

Again, there is simply nothing in the argument of either counsel to suggest the jury was not to consider mitigating evidence unless that evidence reached the level of an insanity or diminished capacity defense. The jury was instructed on factors (d) and (h); and we conclude that these instructions and the arguments of counsel allowed the jury to consider any mitigating evidence relating to defendant's alleged intoxication or mental defects at the time of the crimes. (See generally, *People* v. *Babbitt* (1988) 45 Cal.3d 660, 720-721 [248 Cal.Rptr. 69, 755 P.2d 253]; *People* v. *Lucky* (1988) 45 Cal.3d 259, 296-297 [247 Cal.Rptr. 1, 753 P.2d 1052].)

## XI

*Prosecutor's Argument Regarding Youth as an Aggravating Factor*

Defendant contends that the jury was allowed by the court and urged by the prosecutor to consider his youth as an aggravating factor. The only instruction bearing on this issue was factor (i) of CALJIC No. 8.84.1

which simply permitted the jury to consider "The age of the defendant at the time of the crime." (See also § 190.3, factor (i).) At the time of these killings, defendant was 18 years old.

The flavor of the prosecutor's argument may be gained from considering the following portion of his remarks. After reciting the various statutory aggravating and mitigating factors, including factor (i), he stated: "Viewing these various factors, one can see that, from the different philosophical, religious or moral view, one can consider a factor in aggravation or a factor in mitigation. It's up to the jury, the representatives of this community, to decide that.

"For example, age. Some people would say that, 'Oh, the person is young. He should not be killed. That would be too much of a cruel and inhuman punishment for someone so young.'

"Another point of view or philosophy would be to lock one who is so young up for the rest of their life without the possibility of parole would be too cruel and inhuman to make a person suffer for that long.

"Another way of viewing age could be the person who is elderly, who commits a crime under the conditions in which the ultimate penalty can be imposed, if the person doesn't have much longer to live. The time in which is left to change that individual so that he can become a contributing, albeit in prison, member of society is too short to change, and, therefore, kill him; or a person who is elderly doesn't have that long to live, anyway. Don't kill him.

"Whether his age is a factor in mitigation or aggravation really depends upon a philosophical view, religious or cultural background."

Apparently defendant did not object to this statement, and it seems clear a timely objection and admonition could have cured any harm. (*Ghent, supra*, 43 Cal.3d at p. 775; *Allen, supra*, 42 Cal.3d at p. 1284.) We conclude that in any event defendant was not prejudiced by the prosecutor's remarks or the instruction given.

■■ We have held that ". . . mere chronological age, a factor over which one can exercise no control, should not of itself be deemed an aggravating factor." (*Rodriguez, supra*, 42 Cal.3d at p. 789, italics deleted; see also *Allen, supra*, 42 Cal.3d at pp. 1283-1284.) We have also noted, however, that: "By the same token, mere chronological age of itself should not be deemed a mitigating factor." (*Lucky, supra*, 45 Cal.3d at p. 302.) As we noted in *Lucky*, " . . . the word 'age' in statutory sentencing factor (i) is

used as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case." (*Ibid.*)

 In the present case, instructions and the prosecutor's argument treated age as a somewhat neutral factor and left to the jury the determination of whether such age-related factors as the possible length of defendant's time in prison and the prospects for his change and improvement were or were not mitigating. The instructions did not tell the jury age was to be considered as aggravating; and the prosecutor (despite defendant's persistent contentions to the contrary) did not urge the jury to consider it as such. Clearly the prosecutor left the question entirely up to the jurors based on their individual views. (See also *Babbitt, supra*, 45 Cal.3d at p. 716.)

We conclude that the court's and prosecutor's handling of this issue could have had no improper impact on this verdict.[33]

## XII

### *Prosecutor's Argument Regarding Life Without Possibility of Parole as an "Ultimate Penalty"; References to Religion; Characterizing Mitigating Factors as Aggravating*

 Defendant complains of several other aspects of the prosecutor's argument, the first being that the prosecutor repeatedly argued the jury could find life without possibility of parole, rather than death, was the "ultimate penalty." The prosecutor did indeed ramble on at some length about how different persons from diverse cultural, philosophical, and religious backgrounds might not agree on what is the "ultimate penalty" for murder. He kept returning to the point that this jury had a choice between two "ultimate penalties," death or life without possibility of parole. Defendant asserts this argument minimized and distorted the nature of the choice facing the jury. No objection was made to these remarks and, in any event, they lack merit.

Obviously death is qualitatively different from all other punishments and is the "ultimate penalty" in the sense of the most severe penalty the law can impose. (See *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 329 [86 L.Ed.2d 231, 239-240, 105 S.Ct. 2633]; *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 305 [49 L.Ed.2d 944, 961-962, 96 S.Ct. 2978].) It is simply

---

[33] We also note that defense counsel argued youth was mitigating and discussed at length the impact on defendant of various negative aspects of his upbringing.

inconceivable, however, that the prosecutor's disjointed remarks could have affected the jury's sense of responsibility for determining the appropriate penalty in this case. At worst, the prosecutor's remarks told the jurors that determining what penalty was most severe in this case was something for each of them to decide based on his or her own background. Given the voir dire the jury had been through regarding attitudes toward the death penalty, given defense counsel's arguments and the pleas of defendant's adoptive mother, uncle, and father to spare defendant's life, and given common sense, no juror would have been persuaded by the prosecutor's remarks that death was similar to life without parole in its severity or that the gravity of the decision to be made was lessened in any respect. Indeed, many of the prosecutor's references to "ultimate" penalty seem synonymous with "final" penalty and may have been understood by the jurors as instructing them that the case had come down to two "final" choices.

■■■ Defendant objects to the prosecutor's references to defendant's religion. He argues the prosecutor was making the "subtle argument" that perhaps because of defendant's religious beliefs, death would be a preferable penalty. (Cf. *Zant v. Stephens* (1983) 462 U.S. 862, 885 [77 L.Ed.2d 235, 255, 103 S.Ct. 2733].) We do not agree. The prosecutor's discussion of this subject was certainly not gratuitous, as defendant's adoptive mother had testified that her son's life should be spared because he had "some good things that he can contribute, even if he is in prison for the rest of his life." She agreed with defense counsel's suggestion defendant might be "saved" due to his religious principles, but the context was in terms of life without possibility of parole, not death. The prosecutor's remarks responded to this argument in mitigation by asserting, in essence, that defendant's religious beliefs might save him anyway, and hence defendant's alleged religious beliefs did not constitute a reason not to impose the death penalty. (*Rodriguez, supra*, 42 Cal.3d at p. 790 [propriety of arguing inapplicability of a mitigating factor].) The prosecutor certainly did not argue religion as an aggravating factor of itself militating in favor of the death penalty.

■■■ Finally, defendant claims that the prosecutor argued factors (a) through (k) could be considered in aggravation or mitigation whereas factors (d) through (k) can only be mitigating. We disagree with both parts of this claim. The prosecutor, after reciting the statutory factors, did say:

"Now, these are the guidelines and the factors by which we tell our representatives of our community that they are to decide in a particular case the choice to make between life without parole or the death penalty. [¶] Viewing these various factors, one can see that, from the different philosophical, religious or moral view, one can consider a factor in aggravation or a factor in mitigation. It's up to the jury, the representatives of this

community, to decide that. [¶] [Y]ou can go through a lot of these factors in mitigation and in aggravation, and depending upon your philosophical view and background consider it one way or the other."

It is obvious from the record that his specific remarks were devoted to the factor of age, an issue we have dealt with above. He did not go through each factor in mitigation and say either that its absence was an aggravating factor or that a particular mitigating factor should be considered aggravating. For some factors this would have been not only incorrect but nonsensical— some factors obviously did not apply to this case (e.g., factor (j)), while others are written as exclusively mitigating (e.g. factor (k).) Section 190.3 contemplates that we trust the jury to decide for itself which factors are applicable and which are not (*Ruiz, supra*, 44 Cal.3d at pp. 619-620; *People v. Davenport* (1985) 41 Cal.3d 247, 289 [221 Cal.Rptr. 794, 710 P.2d 861]), and that seems to have been the overall tenor of the prosecutor's remarks. Certainly defense counsel had every opportunity to and did argue the mitigating factors he felt applicable. We find no reasonable possibility that any potential error in the prosecutor's remarks affected the jury's sentencing decision.

## XIII

### *Failure to Instruct the Jury as to Its Ability to Consider Sympathy Evidence*

Defendant proposed, but the trial court did not give, a special instruction which would have explicitly informed the jury that it could consider non-statutory mitigating factors and that any one mitigating factor, standing alone, might suffice to find death was not the appropriate penalty.[34] The court gave instead CALJIC No. 8.84.1 which at the time included, as factor (k), a provision that the jury could consider: "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." ▮ Defendant argues that the unexpanded factor (k) instruction may have misled the jury into believing it could not consider mitigating factors relating to the defendant rather than the crime. As his penalty phase evidence was almost exclusively directed at mitigating

---

[34] Defendant's proposed instruction read: "However, the mitigating circumstances which I have read for your consideration are given to you merely as examples of some of the factors that you may take into account as reasons for deciding not to impose a death sentence. You should pay careful attention to each of those factors. Any one of them may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case. But you should not limit your consideration of mitigating circumstances to these specific factors. You may also consider any other circumstances (relating to the case or to the defendant) as reasons for not imposing the death sentence."

factors relating to his character and background and designed to elicit sympathy from the jury, he urges that this instruction essentially precluded the jury from considering the bulk of his evidence.

The trial in this case occurred prior to our decision in *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], which reaffirmed that a jury may not be precluded from considering as a mitigating factor any aspect of defendant's character and recognized that CALJIC No. 8.84.1 was subject to such a misconstruction. It therefore indicated that trial courts in the future should inform the jury it could consider anything mitigating the gravity of the crime *and* any other aspect of defendant's character or record that defendant offers as mitigating. (*Id.* at p. 878, fn. 10; and see *People* v. *Brown* (1985) 40 Cal.3d 512, 536-537 [220 Cal.Rptr. 637, 709 P.2d 440]; see also *Eddings* v. *Oklahoma* (1982) 455 U.S. 104 [71 L.Ed.2d 1, 102 S.Ct. 869]; *Lockett* v. *Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954].)

■ Where an unexpanded factor (k) instruction has been given, compounded by giving the antisympathy instruction of CALJIC No. 1.00 at the penalty phase, a new penalty trial might be required. (*Easley, supra*, 34 Cal.3d at pp. 875-880; see also *People* v. *Lanphear* (1984) 36 Cal.3d 163, 165-169 [203 Cal.Rptr. 122, 680 P.2d 1081].) But even where an antisympathy instruction has not been given at the penalty phase, the ambiguity of the unexpanded factor (k) instruction might require, in a particular case, a new penalty trial. (*Davenport, supra*, 41 Cal.3d at pp. 282-284.)

■ Even *Davenport,* on which defendant relies, however, does not depart from the principle that factor (k) error must be viewed in the context of any other instructions and the evidence and arguments presented to determine whether the jury may have been misled as to its ability to consider sympathy. (*Davenport, supra*, 41 Cal.3d at pp. 285-286; see also *Babbitt, supra*, 45 Cal.3d at p. 712; *Ghent, supra*, 43 Cal.3d at p. 777; *Allen, supra*, 42 Cal.3d at p. 1276; *Rodriguez, supra*, 42 Cal.3d at p. 786; *Brown, supra*, 40 Cal.3d at p. 544, fn. 17; and see *Mills* v. *Maryland* (1988) 486 U.S. 367, __ [100 L.Ed.2d 384, 393-396, 108 S.Ct. 1860, 1865-1867]; *California* v. *Brown* (1987) 479 U.S. 538, 546 [93 L.Ed.2d 934, 943, 107 S.Ct. 837], O'Connor, J., conc.) We conclude from an examination of this record that there was no possibility the jury was misled into believing it could not consider the mitigating evidence as to sympathy that defendant presented at the penalty phase.

As the Attorney General notes, a no-sympathy instruction was not given at the penalty phase. He fails to mention that a no-sympathy instruction

under CALJIC No. 1.00[35] *was* given at the guilt phase. As we have recently noted, however, this does not necessarily mean the jury at the penalty phase was misled. (*Babbitt, supra*, 45 Cal.3d at p. 718; *Miranda, supra*, 44 Cal.3d at p. 102.) They were not told, for example, to consider guilt phase *instructions*. As noted above, what the jury was presented with at the penalty phase was exclusively defendant's mitigating evidence, and while the prosecutor contested whether that evidence merited the lesser penalty of life without possibility of parole, he never contested the jury's right or duty to consider it. (See *People* v. *Gates, supra,* 43 Cal.3d 1168, 1200-1201.)

The prosecutor discussed the testimony of the relatives, indicating that one might expect such witnesses to speak of love for defendant. He noted defendant's statements of remorse, suggesting that in light of his full testimony this was obviously not sincere and defendant must certainly have remembered bizarre details he now claimed not to recall. He addressed defendant's intoxication which, even if true, did not excuse his conduct.[36] The prosecutor discussed defendant's difficult childhood and the testimony of psychologists, again urging that this did not justify a lesser penalty than death. Never did he suggest to the jury that defendant's evidence was irrelevant, only that it was insubstantial in light of the gravity of these crimes. Indeed the prosecutor specifically told the jury to consider "all of the evidence" and continued: "Now, the evidence in this trial is the evidence that you were given both during the guilt phase and the penalty phase."

Certainly defense counsel's arguments attempted to elicit the sympathy of the jury, addressing the minor cost of imprisonment and the harsh conditions to which defendant would be subject even if his life were spared. (But cf. *Spaziano* v. *Florida* (1984) 468 U.S. 447, 461-462 [82 L.Ed.2d 340, 353, 104 S.Ct. 3154].) He pleaded that defendant was "severely and substantially emotionally and mentally impaired, and that what we don't do in this country is we don't kill people who are sick people. We just don't do it."

While in light of *Easley, supra*, 34 Cal.3d 558, and its progeny we may now say an expanded factor (k) instruction should have been given or that it would have been desirable to specifically inform the jury it could consider any mitigating factor relating to defendant's character or other evidence justifying sympathy for him, we conclude the jury presented with this

---

[35]That instruction provided in pertinent part: "As jurors you must not be influenced by pity for a defendant or by prejudice against him. . . . [¶] You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. . . ."

[36]These remarks were also relevant to a statutory aggravating factor, factor (h). (§ 190.3, factor (h).) (See *ante*, p. 359.)

mitigating evidence was not misled by any ambiguity in the instructions into believing that mitigating evidence should be disregarded.

## XIV

### *Instructing the Jury on Weighing Aggravating and Mitigating Circumstances*

Defendant contends that error in failing to give an expanded factor (k) instruction was compounded by giving the pre-*Easley* version of CAL-JIC No. 8.84.2 which, at the time, told the jury to consider the aggravating and mitigating factors "upon which you have been instructed" and if it found aggravating factors outweighed mitigating, "you shall impose a sentence of death." We have noted before that the ambiguity of the unexpanded factor (k) instruction may be compounded by CALJIC No. 8.84.2 (see *Davenport, supra*, 41 Cal.3d at p. 284). As we noted in *Brown,* it is incorrect to inform a jury that if aggravating factors outweigh mitigating, imposition of the death penalty is mandatory. (*Brown, supra*, 40 Cal.3d at pp. 538-544; see also *Easley, supra*, 34 Cal.3d at pp. 883-884.)

We have explored in several cases the nature of the error which may occur due to CALJIC No. 8.84.2's mandatory wording. The instruction might suggest a mechanical counting of factors rather than an evaluation of the moral or sympathetic value of each aggravating and mitigating factor. (*Gates, supra*, 43 Cal.3d at p. 1204; *Brown, supra*, 40 Cal.3d at p. 541.) The wording might also mislead the jury into believing it should impose the death penalty without regard to each juror's personal view as to the appropriateness of that sentence. (*Myers, supra*, 43 Cal.3d at pp. 273-276; *Allen, supra*, 42 Cal.3d at pp. 1276-1277.) Given the context of this case and the arguments of counsel, however, we conclude the jury was not misled as to its responsibility and authority to determine which penalty was appropriate. (*Id*. at p. 1279.)

The prosecutor told the jurors they were selected as representatives of the community to decide the case since they could call upon their diverse philosophies, views, and experiences. He also repeated the language of CALJIC No. 8.84.2 that if aggravating factors outweigh mitigating, they "will impose" or "shall impose" the sentence of death. But he stressed that the jurors had the ultimate responsibility for determining what sentence should be imposed. He argued: "It is not an automatic decision. [¶] It is not based upon general philosophies of an individual as to what the ultimate punishment, the ultimate protection of society, or the ultimate deterrents in general. [¶] We have, in selecting the representatives of our community to decide this, told them you decide it as to this individual, as to what the

ultimate protection shall be, or the ultimate deterrent shall be as to this person."

The prosecutor went on: "Depending upon the cultural backgrounds, philosophical views, religious attitudes, thoughts concerning psychiatry, thoughts concerning religion, thoughts concerning sociological theories, behavior motivation, things like this, decide based upon certain circumstances what is an aggravation and what is a mitigation, and then, if one outweighs the other, impose one or the other of the ultimate sentences." He stressed: "Depending on how you view these factors, as applied to this defendant, you decide. What should you do."

Certainly defense counsel was quick to correct any misconception that jurors might have as to whether they should vote solely as representatives of the community. He agreed that their votes would represent "your own individual conscience." As he said "You don't represent the community at all. What you do, you represent each one of you individually. . . ." He told the jury it took the vote of 12 individuals to sentence defendant to death and "if any one juror decides he should not die, he would not die." If the death sentence was imposed and carried out, "You have to live with that." Defense counsel then argued that mitigating factors outweighed aggravating and the appropriate punishment was life without possibility of parole.

The prosecutor agreed with defense counsel's remarks that the jury should not just count factors but rather should examine the quality of factors and determine the proper penalty which in their view should be imposed on this defendant. We conclude from a review of all these remarks that the jurors could not have been misled as to their discretion and responsibility in making the penalty decision. (And see *People* v. *Siripongs* (1988) 45 Cal.3d 548, 581-582 [247 Cal.Rptr. 729, 754 P.2d 1306].)

XV

*Imposition of Death Penalty as Cruel or Unusual Punishment or Violation of Due Process*

Defendant's contention that imposition of the death penalty in his case is cruel or unusual punishment or a violation of due process appears to be more a summary of other issues than a discrete issue in its own right. He complains, for example, that it is improper to impose the death penalty when it is not clear the jury concluded he had an intent to kill at the time of these offenses. He complains that the sentencing discretion of the jury was not properly channeled and guided as the jury was precluded from considering nonstatutory mitigating factors, instructed under the pre-*Easley*

mandatory sentencing formula, and permitted to treat youth as an aggravating factor. These issues have been dealt with above.

 The only reasonably new issue is whether imposition of the death penalty was cruel or unusual as applied in this case. (See *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697].) He offers no persuasive analysis of the facts to support this claim, and our reading of the record refutes it.

## XVI

### *Incompetence of Counsel at the Guilt and Penalty Phases*

Defendant claims he was deprived of the effective assistance of trial counsel in several respects. First, he cites as incompetence trial counsel's failure to challenge the "representative adequacy of the venire," particularly with respect to alleged underrepresentation of Hispanics in the venire and on the jury ultimately chosen. Second, defendant complains that counsel failed to object to improper argument by the prosecution. Third, he complains that defense counsel failed to investigate and present an insanity defense or at least present at the guilt phase evidence concerning defendant's troubled family background. Finally, defendant complains that his counsel failed to "take effective issue" with penalty phase instructions concerning whether aggravating factors outweighed mitigating and whether the death penalty was mandatory. None of his contentions have merit on the record before us.

 Defendant has the right to the reasonably competent assistance of counsel acting as a diligent advocate. Even where counsel's decision is a tactical one, defendant has a right to that action not being taken without adequate investigation and consideration of applicable law. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839].) In a claim of incompetence of counsel, it is defendant's burden to establish that trial counsel not only fell below this standard but also that his acts or omissions resulted in withdrawal of a potentially meritorious defense or it is reasonably probable a determination more favorable to defendant would have resulted absent counsel's failings. (*Id.* at pp. 216-218; see also *People* v. *Fosselman* (1983) 33 Cal.3d 572, 583-584 [189 Cal.Rptr. 855, 659 P.2d 1144]; *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

 Defendant has manifestly failed to establish incompetence of counsel under these rules. As to counsel's failure to attack the ethnic composition of the jury venire, the appellate record in this case does not, as we have

noted above, necessarily establish improper underrepresentation of Hispanics.[37]

As for defendant's complaint that counsel failed to object to improper arguments by the prosecutor, he contends that the prosecutor "repeatedly made arguments based upon matters outside the record and not in evidence." As he does not specify what those matters were, we need not address the claim further.

■■■ He contends counsel should have objected to "prejudicial and unwarranted remarks about the desire of the victims' family to see that Hernandez received the death penalty." While under other circumstances such a contention might require us to consider whether irrelevant material had affected a capital sentencing (see e.g., *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529]), the remarks in this case, which occurred during the prosecutor's argument to the jury at the penalty phase, informed the jury that victims do *not* have a role in determining what the penalty should be. Nor do we conclude the prosecutor was using some sort of ruse to bring the matter to the jury's attention while appearing not to do so. The statements in question occurred as the prosecutor attempted to impress on the jurors that they alone would decide penalty. Hence he told them the defendant's preference either for death or life without possibility of parole was not determinative. He stated: ". . . We don't let an individual choose their punishment. [¶] Also, you did not hear testimony by the—we can't bring victims, but the next of kin of the victims as to what the penalty should be, because we don't let that influence the decision." These remarks are even less significant than those we recently found harmless in *Ghent*. (See *Ghent, supra*, 43 Cal.3d at pp. 771-772.)

Defendant also contends counsel should have objected when the prosecutor argued defendant's age could be considered as an aggravating factor. This matter has been discussed at length above and we need not reiterate our conclusions here beyond saying that the prosecutor did not urge that defendant's youth was aggravating and the handling of this factor could not have affected the outcome of this trial.

■■■ Defendant's third complaint that counsel failed to investigate and present an insanity defense is similarly rebutted by the record. Defendant at

---

[37] The record does establish that defense counsel himself sought to excuse one Spanish-surnamed juror for cause due to her pro-death-penalty attitude. It also reveals that counsel made a *Wheeler* motion (see *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]) in response to the prosecutor's use of peremptory challenges to exclude Blacks from the jury. While legitimate grounds for exercise of those challenges were established, the fact that counsel made the *Wheeler* motion indicates he was aware of the general issue of the ethnic composition of the jury.

the penalty phase presented testimony from two psychologists as to defendant's alleged personality deficits. Twice during his arguments to the jury at the end of this phase he discussed this evidence finally stating: "I am not trying to say, again, that excuses what he did. If I had thought that it excused what he did, then I think I would have raised the defense of insanity, and I didn't do that. You would have decided that issue along with the other issues that you had to decide. [¶] I didn't raise that issue. I am not trying to say that he is insane in the legal sense or anything else. [¶] What I am saying is that he is, nevertheless, severely and substantially emotionally and mentally impaired and that what we don't do in this country is we don't kill people who are sick people. We just don't do it." Defendant has failed to establish that there was other evidence of mental disease or defect which counsel did not present or which would have been relevant to the guilt or penalty phase. He thus fails to establish incompetence of counsel on this point.

As for defendant's fourth complaint that counsel failed to take "effective issue" with the penalty phase instructions, no more need be said than that we have previously concluded any error in those instructions could not have misled the jury in this case. Defendant's claim of incompetence of counsel may not, on this record, be sustained.

## XVII

### Denial of Application for Modification of Penalty

Section 190.4, subdivision (e) states that in ruling on an application for modification of a verdict of death, ". . . the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings."

Defendant relies on *Rodriguez, supra*, 42 Cal.3d 730, in which we held that section 190.4, subdivision (e) requires an independent consideration of whether the evidence and aggravating and mitigating circumstances support imposition of the death penalty and in which we required that reasons for denying the modification be given with sufficient particularity so as to permit effective appellate review. (*Id.* at pp. 793-794; see also *People* v. *Thompson* (1988) 45 Cal.3d 86, 140 [246 Cal.Rptr. 245, 753 P.2d 37].) Defendant asserts that nothing indicates the trial judge exercised his independent judgment. Further, he urges, the trial judge failed to specify any

reasons in support of denying the motion. He argues that at a minimum, he is entitled to a new hearing on his motion to reduce the penalty.

We conclude, however, that the judge clearly understood he was to independently weigh the evidence in considering the propriety of the jury's verdict of death, and his statement of reasons for denying the motion for modification, taken in the context of the immediately preceding hearing, was not so inadequate as to require a new hearing. We further conclude that even if the trial judge erred in failing to state his reasons in more detail, there is no reasonable possibility his omission affected the outcome in this case.

## A. The Judge's Findings in Context

Prior to sentencing, the trial judge heard lengthy testimony and arguments on three interrelated motions—defendant's motion for proportionality review, motion for new trial, and motion to modify verdict. It was defendant's theory that the prosecutor had unfairly sought the death penalty in this case, given charging practices in other similar homicides occurring around the same period of time. Defendant was therefore permitted to put on detailed information as to each of more than 28 cases and to examine the person who had been chief deputy of the Los Angeles District Attorney's office during the relevant period of time as to why death had or had not been sought in each of these cases, what factors were influential, and what penalty was ultimately imposed. From the more than 300 pages of testimony and arguments of counsel, it is clear that defense counsel was seeking to demonstrate not just abuse of discretion in charging, but also that death was not an appropriate penalty in the present case.

It is also clear that defendant was asking that the trial judge exercise independent judgment to modify the verdict to life without possibility of parole. (Even the prosecutor, in arguing an issue early in the proportionality hearing, remarked that: "In effect, the statute [an apparent reference to section 190.4, subdivision (e)] requires the court to review the evidence and in effect second-guess the jury in deciding the death penalty that's called for by the statute.") Defendant both in his written motion and in final argument asked the court "to take away the jury verdict" and impose life without possibility of parole not only because the death penalty should not have been sought but because the evidence required modification of penalty. The principal evidence against defendant was, in defense counsel's view, the confession, yet even in the confession and defendant's other statements to police, defendant maintained he had not committed rape since sexual contact had been consensual. Defense counsel therefore felt there was enough weakness in the evidence that modification was required. Responding to

defendant's arguments, the prosecutor urged that the ultimate check on any abusive decision in charging the death penalty was the court's power under section 190.4, subdivision (e). In sum, nothing in the lengthy proceedings prior to the judge's ruling indicates a misunderstanding of the judge's power.

It is against this background that we must view the trial court's own brief statements directly addressing the modification question. The court found sufficient evidence of both rape and sodomy to support the special circumstances. This implicitly rejected the arguments defendant had just made on weaknesses in the evidence and was a decision made by the judge "in view of the evidence produced during the course of the trial *and reviewing all of the evidence.*" (Italics added.)

The court also found aggravating factors outweighed mitigating and went on to indicate what circumstances of the crime it referred to. (See § 190.3, factor (a).) One was that two murders were involved. This finding referenced more than the fact that defendant was charged with the multiple-murder special circumstance. It recalled also testimony by the chief deputy who had said that, even considering all 28 cases and the facts he now knew about defendant, he would still have sought the death penalty in this case because two deaths were involved and because the second killing was supported by eyewitness testimony as to defendant's demeanor and motivation. This provided more convincing proof of defendant's mental state at the time of both killings than would exist with circumstantial evidence alone. While the trial judge commented little during the proportionality hearing, this was one fact he had commented on, noting it was a "big factor" that the murders were a few days apart, negating any heat of passion defense.

The other circumstance was that the killing was in conjunction with rape and sodomy. The court concluded ". . . based on those factors, *the court believes that an independent review of those factors is required under Penal Code section 190.4, subdivision (e).* [¶] The court has set out sufficient reasons for the court's decision and the exercise of the court's discretion in the matter." (Italics added.)

Clearly, a more thorough review of the evidence and more perceptive analysis of aggravating and mitigating factors would have been helpful, but there is more here than was present in *Rodriguez, supra*, 42 Cal.3d 730, and the judge made explicit his understanding that an independent review of the evidence was required.

B. *Nonprejudicial Error*

Even if we were to find the judge's statement of reasons inadequate, we would have to conclude his failure to state more detailed reasons for his

denial of modification was not prejudicial. ■■■ We stated recently in *People* v. *Heishman* (1988) 45 Cal.3d 147 [246 Cal.Rptr. 673, 753 P.2d 629], circumstances in aggravation may so outweigh circumstances in mitigation that "there is no reasonable possibility that a statement of reasons would have altered the trial judge's conclusion or revealed reversible error. [Citations.]" (*Id.* at p. 201.) That is true in this case.

■■■ The most prominent factor in aggravation was factor (a), the circumstances of the murder and its attendant special circumstances of murder in the commission of rape and sodomy and multiple murder. These two young women met horrible deaths after rapes and sodomies of exceptional brutality. They were bound, rendering them helpless. They were sexually abused with great violence and unusual perversion. They were strangled and their nude bodies were dumped in public places for strangers to find. The callousness in biting the breasts of the dead victims, slashing Ryan's abdomen, and burning the victims' pubic hair is almost unbelievable.

Nothing these young women did, even crediting defendant's version of how each woman came to be with him on the night of the crimes, justified any part of their mutilation and killing. Nor was any coperpetrator or accomplice in any way involved. Defendant alone was responsible for these vicious attacks, and the second followed the first by several days, allowing full opportunity for reflection by defendant on the enormity of what he had earlier done. Despite this opportunity, the second murder matched the first in all essential and unusual details.

Against the enormity of these crimes, defendant's mitigating circumstances pale into insignificance. Defendant's youth cannot be equated with immaturity and panic so as to explain this conduct. He did not just slap these women when allegedly they screamed and struggled; he did not fire a shot from a gun held too tightly. Instead, he bound, strangled, and abused them.

The household in which defendant was raised was admittedly a troubled one. As noted above, when he was just a six-year-old child, his adoptive mother had a nervous breakdown followed by years of depression, bizarre behavior, and hospitalization. His adoptive father exercised little discipline, and defendant learned to strike back at the world in a physical way. He became emotionally disturbed. On the night of at least one of the killings, he was also intoxicated to some degree. Nevertheless, an acquaintance testified to certain of his good qualities in trying to help her give up smoking and drinking.

Whatever his good qualities, however, or his emotional disturbance or intoxication at the time of the crimes, mitigating factors clearly did not outweigh aggravating. As we concluded in *Heishman*, "The trial judge's reasons for determining the jury's verdict of death was not contrary to the evidence or law are self-evident, and therefore defendant was not prejudiced by the judge's failure to state reasons [or here, additional reasons] for denying defendant's automatic application for modification of the verdict imposing the death penalty." (*Heishman, supra*, 45 Cal.3d at p. 203.)

## XVIII

### CONCLUSION

One multiple-murder special circumstance is vacated, and the judgment is affirmed in all other respects.

Lucas, C. J., Broussard, J., Panelli, J., Eagleson, J., Kaufman, J., and Rouse (Allison, M.), J.,* concurred.

Appellant's petition for rehearing was denied January 26, 1989. Mosk, J., did not participate therein.

---

* Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.