Filed 5/29/25; Modified and Certified for Partial Pub. 6/27/25 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>JOSHUA DAVID BARNUM,<br><br>　　　Defendant and Appellant. | D082890<br><br><br><br>(Super. Ct. No. SCD274475) |

APPEAL from a judgment of the Superior Court of San Diego County, Eugenia A. Eyherabide, Judge.  Affirmed.

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

Joshua David Barnum appeals from his first degree murder conviction. The trial court instructed Barnum's jury on two theories of first degree

murder: felony murder and direct aiding and abetting. The jury's guilty verdict did not specify on which theory it relied. Barnum challenges the trial court's jury instructions on felony murder, arguing the court had a sua sponte duty to explain the independent felonious purpose rule but failed to do so. Barnum further contends that substantial evidence did not support either ground for first degree murder. We conclude the trial court properly instructed the jury on felony murder without including instructions regarding the independent felonious purpose rule. We also find substantial evidence supported the direct aiding and abetting theory. Finally, we do not address the sufficiency of the evidence regarding felony murder because Barnum fails to affirmatively show the jury relied on that theory. We therefore affirm the conviction.

## II. BACKGROUND

In 2020, Glen Montano, Sean Tran, and Jamie Lugue operated a gambling room out of Glen's garage. Glen lived with his brother Alfredo Montano, but Alfredo was not involved in the gambling room.[1] Barnum also lived at the Montanos' house and he worked in the gambling room providing security and occasionally handling the money. Leaoaisemati Sandoval worked at the gambling room as well.

The entrance for the gambling room was on the side of the garage, where patrons would ring a doorbell outside a gate and await permission for entry. Surveillance cameras positioned at this entrance, as well as inside the garage, captured the following incident.

On June 5, 2020, at approximately 4:00 in the morning, Sean Nixon went to the gambling room. After about 40 minutes, during which time he

---

[1] We refer to the Montano brothers by first name for clarity. No disrespect is intended.

2

repeatedly smoked methamphetamine, Nixon attacked Sandoval. Sandoval oversaw the gambling room's money, and Nixon attempted to steal her fanny pack. Glen came to Sandoval's aid and after a struggle they were able to eject Nixon from the garage.

Nixon attempted to gain reentry moments later. He rang the doorbell at the gate outside the garage and waited for several minutes, occasionally looking through his cell phone. Meanwhile, Barnum and Robert Garcia arrived at the Montano house on the opposite side of the garage. They were met by Glen, and all three walked to the other side of the garage where Nixon stood, and conversed with Nixon for about six minutes.[2] During that time, Nixon appears to make a phone call or calls. Alfredo joined Barnum, Garcia, and Glen in the driveway, where Alfredo had a brief conversation with Glen out of Nixon's view. Alfredo then walked through the house and emerged from the garage gate holding a hatchet. All five men then calmly walked into the garage.

Once in the garage, Sandoval, Barnum, and Nixon argued about Nixon's attempted robbery; Nixon invoked his gang, Skyline Piru. After about 15 minutes, Alfredo and Glen approached Nixon from behind, and once Alfredo stepped past Nixon, Glen wrapped a strap around Nixon's neck and yanked Nixon down as Alfredo turned to grab Nixon's lower body. Barnum joined the scuffle, delivering five punches to Nixon's head and body. Alfredo then punched Nixon numerous times, kicking Nixon three times after he fell to the floor. Barnum stood nearby, watching closely and ultimately saying "Fuck this n----."

---

[2]     The surveillance footage from outside the garage did not have any sound.

Glen dragged Nixon by the strap into the middle of the garage where Nixon laid on his back while Alfredo stepped on Nixon's chest. Alfredo and an unidentified individual instructed others to lock the door, and Vernon Ramos laid a tarp down next to Nixon's body. Barnum closely watched these events unfold.

Glen then stepped on Nixon's neck, continuing to pull on the strap, and Alfredo patted down Nixon's front pants pockets. After Alfredo said he thought Nixon was dead, Barnum walked over to Sandoval and obtained a clear plastic bag. The surveillance footage appears to depict Barnum pointing to the area where Nixon's phone fell, and Alfredo picking up the phone and placing it in the plastic bag Barnum held.[3] Barnum's subsequent conversation with Glen is mostly unintelligible, but Barnum can be heard saying, "take the phone somewhere." Barnum then reached over Nixon's body to give Glen a fist bump, told Glen to call him later, and left. This whole time, Glen continued to hold the strap stand over Nixon.

Glen obtained a trash bag from Sandoval, put it over Nixon's head and left arm, and then wrapped the strap over the bag and around Nixon's neck. Moments later, Glen grabbed a book and pressed it down on Nixon's face. Glen eventually covered Nixon's body with the tarp Ramos had laid down.

After Barnum left, he messaged Sandoval, telling her not to tell anyone about the incident and to let Glen know that the neighbor down the street had a camera pointing toward Glen's house. Sandoval responded telling Barnum to check Nixon's phone to see if Nixon called or texted anyone, to which Barnum replied with a thumbs-up emoji.

---

[3] Barnum later admitted taking the phone, but he remembered picking it up from the floor himself and not using a bag.

Barnum slept at a motel, and then returned to the Montano house later that day to clean the garage and move the gambling machines to a different location. Barnum calmly got to work while Nixon's body remained on the floor covered by the tarp. After Glen and two other men moved Nixon's body into a tent, Barnum cleaned the floor.

Police executed a search warrant at the Montano house about 24 hours after the murder and found Nixon's body. A medical examiner determined that Nixon died from strangulation and suffocation, with blunt head trauma contributing. Police were unable to locate Nixon's phone.

In 2023, the San Diego District Attorney's Office charged Barnum, Glen, Alfredo, and Sandoval with murder (Pen. Code,[4] § 187, subd. (a); count 1), alleging that Glen and Alfredo killed Nixon by means of lying in wait (§ 190.2, subd. (a)(15)). Prosecutors also charged Barnum regarding an unrelated incident with two counts of possession of a firearm by a felon (§ 29800, subd. (a)(1); counts 2–3), unlawful possession of ammunition (§ 30305, subd. (a)(1); count 4), and possession of a controlled substance while armed (Health & Saf. Code, § 11370.1, subd. (a); count 5).

At the four defendants' 2023 trial, the court admitted the surveillance footage depicting the murder. Testifying in his own defense, Barnum denied any intent to kill Nixon and any knowledge that the other participants intended to kill Nixon. Barnum explained that when he punched Nixon, he intended to help Glen and Alfredo expel Nixon from the garage. Barnum also claimed that he was high on methamphetamine, and that he fist bumped Glen out of habit, not encouragement. Barnum admitted taking Nixon's phone with no intention of returning it, claiming he did so to prevent Nixon from reporting what happened. Barnum knew Nixon was a Skyline Piru

---

[4]    Undesignated section references are to the Penal Code.

gang member, and he feared retaliation from that gang. Barnum also admitted discarding Nixon's phone in an alley trashcan after looking through it for calls and texts.

The trial court instructed the jury on two theories of first degree murder for Barnum: direct aiding and abetting a willful, premeditated, and deliberate murder, and felony murder based on robbery of Nixon's phone. Pursuant to CALCRIM No. 540B, the trial court instructed the jury that felony murder applied if Barnum "committed robbery" during which "the perpetrator caused the death of another person," and Barnum "intended to commit, the felony of robbery before or at the time of death." The trial court also defined robbery for the jury using CALCRIM No. 1600, stating that robbery required the specific intent "to deprive the owner of the property permanently," which must be "formed before or during" the use of force or fear to take the property.

The jury found Barnum guilty of first degree murder without specifying its theory. The jury also found Glen and Alfredo guilty of first degree murder, with the lying-in-wait special circumstance true as to Glen but not Alfredo. The jury was not able to reach a verdict regarding Sandoval, and the trial court declared a mistrial as to her. The trial court severed trial on counts 2–5 against Barnum, and after he pleaded guilty to count 3, the trial court dismissed the remaining counts. The trial court sentenced Barnum to prison for 25 years to life for the murder, with a two-year concurrent term for count 3. Barnum's timely appeal followed.

## III. DISCUSSION

### A. *The Trial Court Did Not Err in Instructing the Jury on Felony Murder*

#### 1. First Degree Felony Murder vs. The Felony-murder Special Circumstance

Section 189, subdivision (a) provides that murder is first degree when committed in the perpetration of certain felonies, including robbery. "The mental state required for felony murder is ' "the specific intent to commit the underlying felony" '[5] [citation], and ' "the evidence must establish that the defendant harbored the felonious intent either prior to or during the commission of the acts which resulted in the victim's death." ' [Citation.] First degree felony murder does not require proof of a strict causal or temporal relationship between the felony and the killing. [Citation.] Rather, a killing has been 'committed in the perpetration of' the underlying felony within the meaning of section 189 'if the killing and the felony are parts of one continuous transaction.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 61–62 (*Brooks*).)

In addition to an underlying murder charge, the felony-murder theory can also support a special circumstance allegation. The distinction is important. First degree murder itself is punishable by imprisonment for 25 years to life (§ 190, subd. (a)). But the addition of a special circumstance allegation increases the punishment to life without the possibility of parole or death (§ 190.2, subd. (a)). One of the special circumstance statutes applies when a murder is committed during the commission of a robbery. (§ 190.2, subd. (a)(17)(A).)

"Under the applicable statutes, there is little semantic difference between felony murder based on robbery under section 189 (a killing 'committed in the perpetration of . . . robbery') and the robbery murder

---

5    Felony murder's required mental state for nonkillers also includes that the defendant aid the murder with intent to kill, or the defendant acted as a major participant in the underlying felony and demonstrated reckless indifference to human life (§ 189, subd. (e)). Barnum does not challenge the trial court's instructions on that requirement.

7

special circumstance under section 190.2, subdivision (a)(17) (a killing 'committed while the defendant was engaged in . . . the commission of' robbery).  But courts have fashioned a distinction between the two based on the legislative history of former section 190.2, which imposed the death penalty or life without the possibility of parole on the most serious offenders.  [Citations.]  '[T]o find true a felony-murder special circumstance' under section 190.2, courts require the defendant to have had ' " 'an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental' " ' to the murder." (*People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1025.)  This is referred to as the independent felonious purpose rule.

"[T]he independent felonious purpose rule is not an element of the special circumstance, on which a court must instruct in every case in which a felony murder special circumstance has been alleged." (*Brooks, supra,* 3 Cal.5th at p. 117.)  A trial court has no duty to instruct on the independent felonious purpose rule "unless the evidence supports an inference that the defendant might have intended to murder the victim without having an independent intent to commit the specified felony." (*People v. Monterroso* (2004) 34 Cal.4th 743, 767.)  However, when a felony-murder special circumstance has been alleged and "there is evidence from which the jury could have inferred that the defendant did not have an independent felonious purpose for committing the felony" the court is required to instruct the jury that commission of the felony cannot be merely incidental to the murder. (*Brooks*, at p. 118.)

### 2.    Barnum's Argument

Relying on *Brooks*, Barnum argues the trial court had a sua sponte duty to instruct the jury on the independent felonious purpose rule.  Barnum

acknowledges that the rule originated under felony-murder special circumstance jurisprudence (*People v. Green* (1980) 27 Cal.3d 1, 61), but argues that the special circumstance is directly comparable to the law of felony murder. Barnum also argues that our Supreme Court has repeatedly extended the independent felonious purpose rule's reasoning beyond just special circumstances, including cases involving a murder charge itself supported by the felony-murder rule. Barnum cites several California Supreme Court cases addressing felony murder that repeat the concept from *Green* that the felony involved must not be merely incidental to the killing. (See *People v. Hernandez* (1988) 47 Cal.3d 315, 348; *People v. Proctor* (1992) 4 Cal.4th 499, 532; *People v. Elliot* (2005) 37 Cal.4th 453, 469; *People v. Suarez* (2020) 10 Cal.5th 116, 169 (*Suarez*).)

### 3. Standard of Review

"[A] trial court has a sua sponte duty to instruct on the general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case. [Citation.] We apply a de novo standard when determining whether jury instructions were complete and correctly stated the law. [Citation.] We consider the challenged instruction in the context of the instructions and the record as a whole to determine whether it was reasonably likely the jury misapplied the law." (*People v. Vang* (2022) 82 Cal.App.5th 64, 83–84.)

### 4. Analysis

A different panel of this court previously held that the independent felonious purpose rule does not apply to felony murder. (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 80 (*Andreasen*).) *Andreasen* involved a vagueness challenge to the felony-murder special circumstance and this court found that the independent felonious purpose rule provided "a distinction between the

9

felony-murder offense and the felony-murder special circumstance." (*Id.* at p. 80.)

The *Andreasen* court rejected an argument similar to Barnum's: "We note that, for felony murder, the California Supreme Court has at times stated the felony must not be merely incidental to the killing. (See, e.g., *People v. Elliot*[, *supra*, 37 Cal.4th at p. 469, 475].) However, this principle does not appear to have been developed as a distinct requirement akin to the independent-felonious-purpose rule applied to the felony-murder special circumstance. [Citation.] Also, an independent-felonious-purpose requirement applied by the courts (under the merger doctrine) to felonies that involve only an intent to assault has recently been prospectively overruled by the California Supreme Court for purposes of the felony-murder statute. (*People v. Farley* [(2009) 46 Cal.4th 1053,] 1113–1114, 1117–1122 [disapproving rule that precluded application of felony-murder statute to case where killing occurred during burglary with intent to assault, absent other burglarious intent]; [citation].) The *Farley* decision confirms that the independent-felonious-purpose requirement is confined to the special circumstance and it does not extend to the felony-murder offense." (*Andreasen, supra,* 214 Cal.App.4th at p. 82, fn. 7.)

While the reasoning of *Andreasen* remains sound, we examine Penal Code changes that occurred since that decision. Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) "amended section 189, by adding a new subdivision (e), relating to the felony-murder rule. As amended, section 189 provides that a participant in the perpetration of a qualifying felony is liable for felony murder only if the person: (1) actually killed the victim; (2) aided, assisted, or induced the murder with the intent to kill; or (3) was a major participant in the underlying felony and

10

acted with reckless indifference to human life, as described in subdivision (d) of section 190.2. [Citation.] By adding subdivision (e) to section 189, Senate Bill 1437 made the crime of felony murder subject to the same elements of proof required for a felony-murder special-circumstance finding under section 190.2." (*People v. Vang, supra,* 82 Cal.App.5th at p. 83; but see, *People v. Ervin* (2021) 72 Cal.App.5th 90, 106 [finding that current versions of §§ 190.2 & 189 "are similar in their descriptions, but they are not identical" in that § 190.2 is accomplished if one aids and abets " '*any actor*' " in the crime while § 189 requires aiding and abetting " '*the actual killer*' "].)

Based on Senate Bill 1437, Barnum argues there are no longer any differences between felony murder and the felony-murder special circumstance. Although it is arguable whether Senate Bill 1437 harmonized the statutory elements of felony murder and the felony-murder special circumstance, we find it immaterial since "the independent felonious purpose rule is not an element." (*Brooks, supra,* 3 Cal.5th at p. 117.) Additionally, Senate Bill 1437 focuses on a defendant's mental state regarding the homicide (Stats. 2018, ch. 1015, § 1(b)), while the independent felonious purpose rule relates to a defendant's intent regarding the underlying felony. There is no indication that the Legislature intended to address the independent felonious purpose rule through Senate Bill 1437, or that it intended to unify entirely the concepts of felony murder and the felony-murder special circumstance. (Cf. *People v. Wilkins* (2021) 68 Cal.App.5th 153, 166 ["Senate Bill No. 1437 did not repeal the felony-murder special circumstance"].)

Since *Andreasen,* our Supreme Court has never stated that the independent felonious purpose rule must be satisfied for a felony murder conviction. Further, two recent cases demonstrate that pattern instructions

11

for felony murder, which do not include the independent felonious purpose rule, adequately convey felony murder's requirements.[6]

In *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 497 (*Mora*), a defendant requested an independent felonious purpose instruction regarding his felony murder charge based on an attempted robbery. The trial court rejected that request, finding it duplicative of CALJIC Nos. 8.21[7] and 8.27.[8] (*Mora*, at p. 498.)

The California Supreme Court affirmed that ruling, finding the "[t]he trial court correctly concluded that the proposed instruction's content was adequately conveyed by CALJIC Nos. 8.21 and 8.27. The jury was instructed

---

[6]     Current pattern instructions for felony murder do not include the independent felonious purpose rule (CALCRIM No. 540B; CALJIC No. 8.21), while those for the felony-murder special circumstance do include it. (CALCRIM No. 703; CALJIC No. 8.81.17).

[7]     CALJIC No. 8.21, as given, stated, " 'The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit that crime. [¶] The specific intent to commit robbery and the commission or attempted commission of such crime must be proved beyond a reasonable doubt.' " (*Mora, supra,* 5 Cal.5th at p. 498.)

[8]     As given by the trial court, CALJIC No. 8.27 stated, " 'If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of attempted robbery, all persons who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental. [¶] In order to be guilty of murder, as an aider and abettor to a felony murder, the accused and the killer must have been jointly engaged in the commission of the attempted robbery at the time the fatal wound was inflicted. . . .' " (*Mora, supra,* 5 Cal.5th at p. 498, fn. 19.)

12

that a felony-murder conviction, either directly or under an aider and abettor theory, required as a predicate that [the defendant] committed robbery or attempted to do so. The jury was also instructed that robbery required the specific intent to deprive the victim of property. With the robbery and felony-murder instructions given, the jury was adequately instructed that [the defendant] must have possessed the intent to commit robbery at the time of the killing to be guilty of felony murder, just as [the defendant's] requested instruction would have conveyed." (*Mora, supra*, 5 Cal.5th at p. 499.)

The same result occurred in *Suarez*. There, "[t]he jury was instructed that for felony murder, the unlawful killing must occur during the commission or attempted commission or as a direct causal result of the crime of robbery and the perpetrator must have had the specific intent to commit that crime. The jury was also instructed that for the crime of robbery, 'the perpetrator must have formed the specific intent to permanently deprive an owner of his property before or at the time that the act of taking the property occurred' and 'before or at the time of the application of force or violence, or the use of fear or intimidation.' " (*Suarez, supra,* 10 Cal.5th at p. 168.)[9] The California Supreme Court found that with these instructions, " 'the jury was adequately instructed that [the defendant] must have possessed the intent to commit robbery at the time of the killing to be guilty of felony murder.' " (*Ibid*.) It therefore affirmed the trial court's denial of the defendant's request for an instruction on independent felonious intent. (*Id*. at pp. 167–168.)

---

[9]     The opinion in *Suarez* does not identify the source of these instructions nor quote them in full. The quoted language, as well as another portion of the opinion, suggests the court in *Suarez* used CALJIC instructions. (*Suarez, supra,* 10 Cal.5th at p.170; CALJIC No. 9.40.2.)

As with *Brooks,* in both *Mora* and *Suarez*, the jury heard evidence from which it could infer that the underlying robberies were incidental to the murders. (*Mora, supra,* 5 Cal.5th at p. 491; *Suarez, supra,* 10 Cal.5th at p. 169.) But unlike *Brooks*, the high court did not require an independent felonious purpose instruction for either *Mora* or *Suarez*. Instead, our Supreme Court affirmed the trial courts' refusal of the independent felonious purpose instruction. Indeed, the court in *Mora* referred to the instruction as a "pinpoint instruction" (*Mora, supra,* 5 Cal.5th at pp. 497–499), which " ' "are not required to be given sua sponte." ' " (*People v. Lujano* (2017) 15 Cal.App.5th 187, 191.)[10] This reinforces to us that there is no sua sponte duty to instruct the jury on the independent felonious purpose rule when the defendant is charged with first degree felony murder.

Additionally, like *Mora* and *Suarez*, the trial court here instructed the jury that a felony murder conviction required as a predicate that Barnum "committed robbery" during which "the perpetrator caused the death of another person," and that robbery required the specific intent "to deprive the owner of the property permanently," which must be "formed before or during" the force or fear used to take the property. The trial court further instructed that for felony murder to apply, Barnum "must have intended to commit, the felony of robbery before or at the time of death." "Thus, '[w]ith the robbery and felony-murder instructions given, the jury was adequately instructed that [Barnum] must have possessed the intent to commit robbery at the time of the killing to be guilty of felony murder.' " (*Suarez, supra*, 10 Cal.5th at p. 168.)

---

10     We note that *Mora* does not mention *Brooks*, and *Suarez* cites *Brooks* for a different proposition. (See *Suarez, supra,* 10 Cal.5th at pp. 170–171.)

Based on the foregoing, the trial court adequately instructed the jury on felony murder, and it was not required to instruct on the independent felonious purpose rule. We therefore see no instructional error.

B.   *Sufficient Evidence Supports the Direct Aiding and Abetting First Degree Murder Theory, and Barnum has not Affirmatively Shown the Jury Relied on the Felony-murder Theory*

Barnum challenges the sufficiency of the evidence for both first degree murder theories. He claims the direct aiding and abetting theory lacked support because there was insufficient evidence that he intended to kill Nixon or that he aided or encouraged the murder. As for felony murder, Barnum claims there was no evidence that force was applied to Nixon for the purpose of taking his phone and there was insubstantial evidence that the murder was committed in the perpetration of a robbery.

We find sufficient evidence supports the direct aiding and abetting theory. Because that theory is adequately supported and Barnum has failed to affirmatively show that the jury relied on the felony-murder theory, we do not reach Barnum's evidentiary challenges to that theory.

1.   Standard of Review

When a defendant challenges the sufficiency of the evidence supporting a conviction, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780.) We do " ' "not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." ' " (*People v. Helzer* (2024) 15 Cal.5th 622, 646.)

15

"When a jury has been instructed on both proper and improper theories for conviction, the appropriate standard of prejudice turns on the type of error involved.  If the improper theory 'is incorrect only because the evidence does not support it' [citation], reversal is not required if 'a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground.' " (*People v. Mumin* (2023) 15 Cal.5th 176, 207.)

2.    Sufficient Evidence Supports the Direct Aiding and Abetting First Degree Murder Theory

"For a defendant to be liable as a direct aider and abettor, 'the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.' " (*In re Lopez* (2023) 14 Cal.5th 562, 579.)

Barnum watched Glen approach Nixon from behind and wrap a strap around Nixon's neck.  Glen's actions indicated he wanted to strangle Nixon, and Barnum quickly joined in, helping Glen and Alfredo overpower Nixon by punching Nixon in the head and body five times.  The medical examiner determined that blunt head trauma contributed to Nixon's death.

Glen and Alfredo further demonstrated intent to kill Nixon when Glen dragged Nixon across the floor by the strap and Alfredo stood with one foot on Nixon's chest.  Any intention of releasing Nixon was further dispelled when Alfredo and another individual sought to lock the door, and Ramos laid a tarp down next to Nixon's body.  Although Barnum had stopped punching, he observed these actions from close by.

Glen's murderous actions continued when he stepped on Nixon's neck and continued to pull the strap.  Barnum's actions further demonstrated his desire to assist in the murder because he took Nixon's phone, looked through

16

it, and then disposed of it. Barnum also texted Sandoval a thumbs-up emoji confirming that Barnum had checked Nixon's phone to see if Nixon communicated with anyone about what was occurring. From this, the jury could infer that Barnum intended to help his cohorts by preparing for any retaliation from Nixon's gang or by disposing of evidence. Barnum also exhibited encouragement by reaching over Nixon's body to fist bump Glen while Glen continued to stand over Nixon and hold the strap around Nixon's neck. Finally, by warning Glen of the neighbor's surveillance cameras and cleaning the garage later the same day, Barnum further demonstrated his intent to aid in the murder's commission.

Under these circumstances, the jury could reasonably find that Barnum knew of and shared Glen's intent to kill Nixon, and that Barnum assisted the murder's commission. We therefore find sufficient evidence that Barnum directly aided and abetted the murder.

3. Barnum Fails to Affirmatively Show the Jury Relied on the Felony-murder Theory

Barnum argues that based on his testimony and two notes from the jury, it is extremely likely the jury relied on the felony-murder theory. He also argues the felony-murder theory was the most straightforward route to a first degree murder verdict.

The trial court received the first jury note during Barnum's testimony. That note asked, "Will the legal terms/details of murder charge be explained to us again? If found not guilty, can defendants be charged with different level of homicide?" The trial court decided to address this note with the jury instructions.

In the second note, the jury asked during deliberations, "If we conclude that the offense is first degree murder, can we conclude that a person involved in the offense is aiding and abetting involuntary manslaughter, or

17

do we have to conclude that they are aiding and abetting in first degree murder?"  In response, the trial court informed the jury that it "must separately consider the evidence as it applies to each defendant's intent and/or mental state individually," and "must decide each charge for each defendant separately."

Barnum argues these notes indicate the jury was grappling with his lesser involvement in the murder.  First, neither note refers to Barnum.  The first note could apply to all four defendants, while the second note could apply to the three non-actual killer defendants.  Second, neither note referred to felony murder or suggests the jury relied on that theory.  The second note states the jury was considering aiding and abetting.

To support his claim that felony murder was the most straightforward theory, Barnum argues that felony murder spared the jury the necessity of calibrating Barnum's mental state and considering self-defense and provocation.  But the jury needed to consider Barnum's mental state under felony murder because as the trial court correctly instructed, guilt under that theory required that Barnum either intended to kill or acted with reckless indifference to human life.  The jury also rejected claims of provocation and self-defense in finding Glen and Alfredo guilty of willful, premeditated, and deliberate murder.  Further, Barnum's argument presumes the jury let the instructions dictate the facts, but the jury was instructed otherwise.  (CALCRIM No. 200 ["After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."].)  We presume the jury followed those instructions (*People v. Thomas* (2023) 14 Cal.5th 327, 382), and based on the surveillance footage, direct aiding and abetting was the more obvious scenario shown by the evidence.

18

Finally, Barnum's testimony provides no indication as to what theory the jury relied on.  Indeed, the verdict signifies that the jury did not accept Barnum's version of the events.

Under these circumstances, Barnum fails to show affirmatively that the jury's verdict was premised on felony murder.  Because the direct aiding and abetting theory is adequately supported, we need not address the sufficiency of the evidence regarding the felony-murder theory.

## IV. DISPOSITION

The judgment is affirmed.

RUBIN, J.

WE CONCUR:

DO, Acting P. J.

CASTILLO, J.

Filed 6/27/25

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSHUA DAVID BARNUM,<br><br>    Defendant and Appellant. | D082890<br><br><br>(Super. Ct. No. SCD274475)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION, ORDER DENYING REHEARING, AND ORDER MODIFYING THE OPINION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

The opinion in this case filed May 29, 2025, was not certified for publication. However, the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); therefore, respondent's request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

It is further ordered that the opinion be modified as follows:

1.      On page 2, delete the sentence "Finally, we do not address the sufficiency of the evidence regarding felony murder because Barnum fails to affirmatively show the jury relied on that theory."  And replace with, Finally, we do not address the sufficiency of the evidence regarding felony murder because Barnum fails to affirmatively show a reasonable probability that the jury relied on that theory.

2.      On page 15, with respect to section B.'s heading (following, "*has not Affirmatively Shown*" and before "*the Jury Relied*") insert: *Reasonable Probability That.*

3.      On page 15, replace the second sentence of the second paragraph of section B. (beginning, "Because that theory . . . .") with:  Because that theory is adequately supported and Barnum has failed to affirmatively show a reasonable probability that the jury relied on the felony-murder theory, we do not reach Barnum's evidentiary challenges to that theory.

4.      On page 16, replace the first full paragraph (beginning, " 'When a jury . . . .' ") with:

> "When a jury has been instructed on both proper and improper theories for conviction, the appropriate standard of prejudice turns on the type of error involved." (*People v. Mumin* (2023) 15 Cal.5th 176, 207.)  If the improper theory is incorrect only because the evidence does not support it, "the appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130.)

5.      On page 17, replace section B.3's heading, with:  <u>The Record Does Not Affirmatively Demonstrate a Reasonable Probability That the Jury Solely Relied on the Felony-murder Theory</u>.

6.      On page 19, replace the first sentence of the second full paragraph (beginning, "Under these circumstances . . . .") with:  Under these circumstances, the record does not affirmatively show a reasonable probability that the jury's verdict was premised on felony murder.

There is no change in judgment.

The petition for rehearing is denied.


                                                          DO, Acting P. J.


Copies to:  All parties

3